GRIFFIS, J.,
for the Court.
¶ 1. A.B. and B.B.[1] appeal from the Lauderdale County Youth Court’s termination of their parental rights, alleging (1) that the court erred in failing to appoint a lawyer for A.B. at the initial hearing on a petition for neglect brought against them by the Lauderdale County Department of Human Services (DHS), (2) that the court erred in not considering less permanent alternatives to termination of their parental rights, and (3) that the court erred in terminating B.B.’s parental rights when B.B. did not receive notice or summons regarding the neglect hearing. Finding no error, we affirm.
FACTS
¶ 2. A.B. and B.B. are the parents of three children that are at issue here: two girls, Tonya and Sonya, and a boy, Ned. Tonya and Sonya are twins who were born *52 on November 1, 2001. Ned was born on September 20, 2003. At some point while A.B. was pregnant with Ned, the Lauder-dale County Department of Human Services became aware of allegations that Tonya and Sonya were living in a poorly kept house and were being exposed to drugs. After an investigation, DHS took custody of Tonya and Sonya on August 26, 2003, pursuant to an order from the youth court. Around the same time, A.B. admitted that she was currently using drugs even though she was pregnant. DHS took custody of Ned on September 22, 2003, two days after he was born.
¶ 3. Thereafter, A.B. and B.B. entered into a service agreement with DHS that was intended to make A.B. and B.B. fit to rear their children. On May 4, 2004, the court returned custody of the three children to A.B. and B.B. because they had completed their service agreement. Subsequent inquiries by DHS revealed that A.B. and B.B. appeared to be taking adequate care of the children. DHS was relieved of any further' responsibility for the children on June 10, 2004.
,¶ 4. In early November 2004, A.B. attended her father’s funeral. Her actions at the funeral led to concerns that she was once again abusing drugs, and DHS was contacted. On November 9, 2004, after two unsuccessful attempts to locate A.B. and the children, Brenda Snowden, a social worker with DHS, went to A.B.’s home. Peering through a glass in a storm door, Snowden observed the three children, but no adults. One of the girls came over and opened the door. Snowden observed that Ned appeared to be adequately clothed and sufficiently cared for, but she noted that the same was not true of the twins. One of the girls was completely naked, while the other had on a diaper that was so saturated with urine and feces that it hung down to her knees. Snowden called repeatedly for A.B., to no avail. After walking down a hallway, Snowden found A.B. and a man on a bed in another room. The man was not B.B., and A.B. had on nothing but a T-shirt. Snowden stated that she had great difficulty waking A.B., who appeared to be in a deep slumber. Although it was two in the afternoon, A.B. stated that she was in bed because she had just fed the children breakfast and had then gone back to bed. Snowden requested a urine sample from A.B., which A.B. gave. Analysis of the sample revealed that it was too diluted to be useful in determining whether A.B. had been using drugs. Another urine sample taken later in November also came back as diluted.
¶ 5. On November 30, 2004, pursuant to a court order transferring custody of the children to DHS, Snowden, accompanied by Gypsy Ward, a Lauderdale County deputy, went to the home[2] where she had found A.B. and the children on November 9. Snowden and Ward did not find A.B. or the children, but Ward found a plastic bag containing what appeared to be a contraband substance.[3] Ward testified that the house was “horrible. It was-it was nasty. They didn’t have no [sic] power; didn’t have no [sic] water and they was [sic] using the toilet and couldn’t flush it.” After the discovery of what appeared to be a controlled substance, Ward contacted the *53 Drug Task Force, and Anthony Ball, a drug task force agent, came to assist. After finding no one at the home, Snowden proceeded to a trailer on the other side of Lauderdale County where she had reason to believe the children were located.[4] At the trailer, Snowden encountered B.B., who claimed that he did not know where A.B. was. However, one of the children told Snowden that A.B. had climbed out of a window of the trailer and had run away in response to Snowden’s approach. After she was located, A.B. denied that she had climbed out of a window of the trailer.
¶ 6. A.B. was arrested for possession of drugs based on the substance that was found in the plastic bag at the house on November 30.[5] On December 30, 2004, the court held a neglect hearing. B.B. was not present at the hearing because he could not be located. A.B. was present at the hearing and admitted that she could not take care of her children due to her incarceration. Additionally, she testified that she passed a drug screen on November 30 or December 1 after she was incarcerated. Her probation officer, William Lucy, confirmed the truthfulness of this testimony. At the conclusion of the hearing, the court found that the children were neglected and ordered DHS to “immediately pursue termination of parental rights” of A.B. and B.B. On April 14, 2005, B.B. sent a letter to the court, explaining that he had retained an attorney. On May 26, 2005, DHS filed a petition to terminate A.B. and B.B.’s parental rights.
¶ 7. A hearing on the termination of parental rights was held on July 13, 2006, over a year after the filing of the petition and more than a year and a half after the neglect hearing. A.B. was present at the hearing with counsel. B.B. apparently could not be found and was not present at the hearing. At the hearing, testimony was elicited regarding the November 2004 events, as well as the events that had happened when A.B. and B.B. lost custody of them children in 2003. The court essentially refused to hear any evidence of A.B.’s rehabilitation between December 30, 2004, and the date of the hearing a year and a half later. Specifically, the court refused to allow A.B.’s probation officer to testify that A.B. had tested negative on two drug tests since November 2004.
¶ 8. In its order terminating parental rights, the court found that A.B. and B.B.:
exhibit ongoing behavior which would make it impossible to return the Minor Petitioners to said Respondents’ care and custody because said Respondents have a drug addiction, unlikely to change within a reasonable time, which condition makes said Respondents unable to assume minimally, acceptable care of the Minor Petitioners constituting grounds for termination of their parental rights....
The Court finds that the Respondents ... exhibit and have failed to eliminate ongoing behavior, identified to said Respondents by the Lauderdale County Department of Human Services, which prevents placement of the Minor Petitioners with said Respondents in spite of diligent efforts of the Department of Human Services to assist said Respondents constituting grounds for termination of their parental rights....
*54 The Court finds that [Tonya, Sonya, and Ned] have been adjudicated to have been abused or neglected and custody has been transferred from [A.B. and B.B.] for placement pursuant to Section 43-15-13 of the Mississippi Code of 1972, Annotated, and a court of competent jurisdiction has determined that reunification shall not be in the Minor Petitioners’ best interest, constituting grounds for termination of their parental rights....
¶ 9. We now consider whether the youth court erred by terminating the parental rights of A.B. and B.B.
ANALYSIS

1. Appointment of Attorney

¶ 10. A.B. complains that she was not appointed an attorney at the December 30 neglect hearing. The record is void of any request by her for an attorney. Documentation sent to her regarding the neglect hearing clearly stated that she was entitled to have an attorney present to represent her. We have found nothing that indicates that the court should have sua sponte appointed A.B. an attorney. This issue is without merit.

2. Propriety of Termination

¶ 11. Although A.B. and B.B. frame their contentions on this issue in terms of the court’s failure to consider alternatives other than permanent termination of parental rights, we have chosen to address the core question: whether the court erred in terminating A.B. and B.B.’s parental lights.
¶ 12. There is a two-part test, initially outlined in Petit v. Holifield, 443 So.2d 874, 877 (Miss.1984), that a court must use when deciding whether to terminate the parental rights of a natural parent. W.A.S. v. A.L.G., 949 So.2d 31, 35(¶ 10) (Miss.2007). “First, the petitioner must establish by ‘clear and convincing evidence that the objecting parent has either abandoned or deserted the child or is mentally or morally or otherwise unfit to rear or train the child.’” Id. (quoting Petit, 443 So.2d at 877). If the court finds that the first prong is satisfied, it must then consider whether termination is in the best interest of the child. Id.
¶ 13. The Mississippi Legislature has established guidelines for determining whether the parental rights of a natural parent should be terminated. Mississippi Code Annotated section 93-15-103(3) (Rev. 2004) specifies several grounds upon which parental rights may be terminated. Clear and convincing evidence of any one of the grounds is sufficient to warrant termination. W.A.S., 949 So.2d at 35(¶ 11).
¶ 14. While the basis for terminating parental rights is clear and convincing evidence, on appeal, our standard of review dictates that we may reverse the decision of the youth court “only if reasonable men could not have found as the youth court did beyond a reasonable doubt.” May v. Harrison County Dep’t of Human Servs., 883 So.2d 74, 77(¶ 10) (Miss.2004). Additionally, where no jury was involved, the trial court’s factual determinations will only be disturbed where the record lacks substantial supporting evidence. Id. Substantial evidence is “such relevant evidence as reasonable minds might accept as adequate to support a conclusion.” G.Q.A. v. Harrison County Dep’t of Human Servs., 771 So.2d 331, 335(¶ 15) (Miss.2000) (quoting Hooks v. George County, 748 So.2d 678, 680(¶10) (Miss.1999)). Here, the youth court correctly found that there was substantial evidence to support the termination of parental rights.
¶ 15. Mississippi Code Annotated section 93 — 15—103(3)(e)(i) and (ii) (Rev.2004) provide:
*55 (3) Grounds for termination of parental lights shall be based on one or more of the following factors:
(e) The parent exhibits ongoing behavior which would make it impossible to return the child to the parent’s care and custody:
(i) Because the parent has a diagnosable condition unlikely to change within a reasonable time such as alcohol or drug addiction, sever mental deficiencies or mental illness, or extremely physical incapacitation, which condition makes the parent unable to assume minimally, acceptable care of the child; or
(ii) Because the parent fails to eliminate behavior, identified by the child caring agency or the court, which prevents placement of said child with the parent in spite of diligent efforts of the child caring agency to assist the parent!.]
(Emphasis added).
¶ 16. The youth court found, and we agree, that the parents have failed to eliminate prior behavior identified by the child caring agency and the court. Previously, A.B., the mother, was pulled over by the police with her children in the car. The police found a burner, police scanner, and a recipe for crystal methamphetamine. A.B. also admitted to using crystal methamphetamine while pregnant. The father, B.B., had been arrested on drug charges and was not present during the current termination of parental rights proceedings. Both parents have served time in prison on drug-related charges. The parents were given another chance to show that they could adequately care for their children.! They failed.
¶ 17. Not even six months after they regained custody, a social worker from DHS came by the home to check on the children. In the middle of the afternoon, as she approached the door, the social worker saw the three young children inside the home, but she did not see an adult. After repeatedly knocking on the door, one of the children finally let the social worker in the house. The social worker saw one child, who was naked, and another child whose diaper was so saturated that it hung at the child’s knees. The social worker continued to call for A.B., but received no answer. When she finally found A.B., she was in her bedroom, lying on the bed with a man who was not her husband, wearing no underwear, and looking dazed. A.B. then submitted to a drug test, and when it came back diluted, A.B. refused to give a hair sample. The tidal judge correctly found:
Obviously if [A.B.’s] involved in controlled substances enough, she knows what the indicators would be if she were to give the hair sample and she flat refused to do that, that shows to the Court a lack of cooperation and desire to do those things necessary to rehabilitate herself and to regain custody of her children.
¶ 18. The same afternoon, a deputy sheriff arrived and found the children living in the house with no water or power. The deputy reported finding spoons, weights, and nine grams of amphetamines in the house. When asked if the house was a good place for a child, the deputy responded, “I wouldn’t have a dog in there.” Later, when the police were looking for A.B., one of her children claimed that she jumped out of a window to avoid them. Another officer testified that both A.B. and B.B. were still doing drugs.
¶ 19. In Ainsworth v. Natural Father, 414 So.2d 417, 420 (Miss.1982), the Court noted that “desertion” of a child involves an avoidance of a duty or obligation. Par *56 ents have a duty to provide their children with adequate care, a drug-free environment, electricity, and running water. Here, the conditions of the children’s home, where the social worker discovered this type of neglect, were sufficient to show that A.B. failed in her duty and obligation to provide adequate care for her children.
¶ 20. While it is true that the youth court should have taken all evidence of A.B.’s drug use into account, we find that there is more than enough evidence to show that A.B. was unfit to raise her children. The officers found spoons, weights, and nine grams of amphetamines. Although the drug charges were later dropped, the youth court could certainly find that A.B. was still using drugs. The possibility of drug use, coupled with the fact that A.B. was neglecting her children, was half-naked in bed with a strange man, was non-responsive to the social worker, claimed to have just fed breakfast to her children at 2:00 p.m., and refused to give a hair sample for a drug test after her urine sample came back diluted, all show that A.B. provided an unreasonable and unsafe environment for her children. As the trial judge stated, the “failure to cooperate with DHS further showed an indication that the conduct in controlled substances were [sic] preferred over the children.”
¶ 21. Although termination of parental rights is an extreme measure that should be used sparingly, in N.E. v. L.H., 761 So.2d 956, 961-62(¶ 12) (Miss.Ct.App.2000), this Court held:
Legal custody and guardianship by persons other than the parents as well as other permanent alternatives which end the supervision by the Department of Human Services should be considered as alternatives to the termination of parental rights, and these alternatives should be selected when, in the best interest of the child, parental contacts are desirable and it is possible to secure such placement without termination of parental rights.
The N.E. court also emphasized that the children’s needs, living conditions, family environment, and other circumstances must be taken into account when determining what is best for the children. Id. at 967(¶ 34). Here, the children were placed in the custody of their aunt and uncle. They were not handed over to complete strangers or put in an orphanage.
¶ 22. Having considered the factors set forth by this Court in N.E., and reviewed all of the available evidence as shown in the record, we find that there was sufficient evidence for the youth court to terminate parental rights. Accordingly, this issue is without merit.

3. Service on B.B.

¶ 23. B.B. contends that he did not receive notice or summons regarding the neglect hearing. However, the record reflects that the Lauderdale County Sheriffs Department committed a diligent search in trying to serve B.B. with notice of the adjudicatory hearing. The youth court noted that B.B. chose not to appear, even though he had knowledge of the hearing and he had been present at the prior proceedings. B.B.’s wife, A.B., also testified that she did not know his whereabouts. B.B.’s failure to appear in court, coupled with a recent arrest for methamphetamine, show his current unfitness to be a parent and his failure to eliminate prior behavior. Accordingly, this issue is without merit.
¶ 24. THE JUDGMENT OF THE YOUTH COURT OF LAUDERDALE COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.
*57 LEE AND MYERS, P.JJ., CHANDLER, BARNES, ISHEE AND CARLTON, JJ., CONCUR. IRVING, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KING, C.J., AND ISHEE, J. ROBERTS, J., NOT PARTICIPATING.

. We use false initials for the parents to protect the identity of the minor children, to whom we have also assigned fictitious names in this case.

. The order was based on an affidavit executed by Snowden on November 30. In the affidavit, Snowden detailed what she found at A.B.’s home on November 9. According to Snowden, she sought the court order after the urine sample came back diluted and A.B. refused to submit to a hair screen.

. Later analysis of the substance revealed that it was not illegal drugs, and possession charges against A.B. resulting from the discovery of the substance were dropped.

. A.B. testified that she was no longer living at the home where she and the children had been living on November 9.

. The record indicates that A.B. was arrested on November 30 or December 1, 2004, and remained in jail on the drug charge until May 11, 2005, when the charges were dropped because the substance seized on November 30 was not a controlled substance.