ON WRIT OF CERTIORARI
 

 KITCHENS, Justice,
 

 for the Court.
 

 ¶ 1. A.B. and B.B.
 
 [1]
 
 appeal the Lauder-dale County Youth Court’s termination of their parental rights. The Mississippi Court of Appeals affirmed the decision, and this Court granted the parents’ petition for writ of certiorari. Finding error, we reverse the Court of Appeals and remand the case for further proceedings.
 

 Facts
 

 ¶ 2. On August 22, 2003, the Lauderdale County Department of Human Services (DHS) took custody of two of the appellant parents’ children, Tonya and Sonya, after the mother, A.B., was arrested for possession of methamphetamine. Tonya and Sonya are twins, born on November 1, 2001. At the time, A.B. was eight months pregnant with Ned and admitted that she had abused drugs during her pregnancy. DHS took custody of Ned on September 22, 2003, two days after he was born.
 

 ¶ 3. DHS filed formal petitions for adjudication of neglect and/or abuse regarding all three children. On October 21, 2003, a
 
 *1265
 
 consent judgment was entered, giving physical custody of the children to a maternal aunt and uncle. The mother entered into a service contract with DHS, and the father, B.B., was ordered to complete parenting classes. The parents subsequently regained custody of their children, and the court discharged DHS from further responsibility on June 10, 2004.
 

 ¶4. Five months later, DHS initiated another investigation after it was informed that the mother allegedly was using drugs again. On November 9, 2004, two DHS social workers went to the family’s house and found the mother asleep in the bedroom along with a man she identified as her stepbrother. Both social workers testified that: A.B. came out of the bedroom wearing only a t-shirt; one of the twins was unclothed; the other twin was wearing a saturated diaper that hung to her knees; Ned was adequately clothed; and A.B. told the social workers they had just eaten breakfast, although it was two in the afternoon. A.B. responded that she actually said they had just eaten lunch, not breakfast, and that she was wearing only a t-shirt due to having just soiled her underwear in consequence of her menstrual cycle.
 

 ¶ 5. A.B. gave a urine sample that day, but the test results are disputed. Three affidavits signed by one of the social workers averred that A.B. “failed” the drug screen and that the sample was “diluted or not human urine.” The same social worker testified that the lab told her that the sample was diluted because “it was probably not human or something had been added to the urine.” However, an employee of the lab testified during the termination proceedings that the results were “negative” and that the test was not diluted.
 

 ¶ 6. On November 29, 2004, DHS requested another drug screen. A.B. was asked to give both a hair and urine sample. She refused to give a hair sample, but she did give a urine sample. According to the lab report, the urine sample was diluted.
 

 ¶ 7. The same affidavits that alleged A.B. “failed” the November 9, 2004, drug screen also stated that A.B. “was asleep in the bed with an adult male and was not supervising” the children. Based on these affidavits, on November 30, 2004, the youth court ordered that DHS take the children into custody. A DHS social worker, accompanied by a deputy sheriff, then went to the home where A.B. and the children had been found three weeks earlier. Although the social worker and the deputy sheriff testified that all of the family’s belongings were still at the house, A.B. claimed that they were in the process of moving in with her mother. No one was at the house, and the social worker and the deputy sheriff testified that the house was filthy and that there was no power or running water. The deputy sheriff searched the house and found a plastic bag containing a white substance that appeared to them to be methamphetamine. A member of the sheriffs drug task force testified that he performed a field test which was positive for methamphetamine. However, later analysis revealed that the seized material was not an illegal substance.
 

 ¶ 8. Later that day, the children were found at A.B.’s mother’s house. At least two deputy sheriffs and a DHS social worker were present. All three testified that B.B., the father, was at the house but the mother could not be found. They also testified that two other children present at the house that day told a deputy sheriff that A.B. had jumped out a window. However, according to one deputy sheriff, B.B. said that A.B. had gone to move more things from the old house.
 

 
 *1266
 
 ¶ 9. A short time later, A.B. and B.B. were arrested for possession of the white substance found at the other house. A.B. remained in jail for more than five months until the charge was dropped because the substance had tested negative for illegal drugs. The record indicates that B.B. was released a short time after his arrest, but the record is silent as to what disposition was made of the charge against him.
 

 ¶ 10. In the meantime, the youth court held a neglect hearing on December 30, 2004. The father, B.B., was not present, and the sheriffs department was unable to locate him. A.B., the mother, was brought to the hearing from jail. She had no lawyer at that hearing. The court heard testimony from the social workers and the deputy sheriffs about the events of November 9 and 30, 2004. The mother denied that the family was living at the house where the alleged drugs were found, and also testified that she had passed a drug test for her probation officer on November 9 and again on November 30 or December 1, 2004, the day of her incarceration. No other evidence was heard on her behalf, and upon recommendation by DHS, the youth court ordered that DHS pursue termination of B.B.’s and A.B.’s parental rights.
 

 ¶ 11. On July 13, 2006, more than a year and a half after the neglect hearing, the youth court held a hearing on the termination of parental rights. A.B., the mother, was present and represented by counsel. The father, B.B., was summoned by publication and did not appear. At the hearing, the court heard testimony about the November 2004 events and the circumstances surrounding the parents’ first loss of custody in 2003. No evidence was presented about the alleged illegal substance found at the home on November 30, 2004, other than testimony from A.B.’s probation officer that the charge had been dropped.
 
 [2]
 
 Additionally, the court refused to hear any evidence of A.B.’s progress toward rehabilitation since December 30, 2004, specifically, that she had passed two drug tests in 2005. The guardian ad litem testified very briefly, stating that he had been present at all of the youth court proceedings involving the children and that he recommended terminating parental rights. Specifically, the guardian ad litem concluded that “[r]e-fusing the drug test was just — eliminates sort of her chance at a third bite at the apple.”
 

 ¶ 12. At the close of the hearing, the youth court terminated A.B. and B.B.’s parental rights based on their “drug addiction” and stated in its judgment that the youth court had made a previous determination at the 2004 neglect hearing that reunification was not in the best interest of the children.
 

 Issues
 

 ¶ 13. A.B. and B.B. raised three issues on appeal: (1) whether A.B. was entitled to counsel at the neglect hearing; (2) whether the youth court erred in terminating A.B.’s and B.B.’s parental rights; and (3) whether B.B. was properly served notice of the neglect hearing. This Court will address only whether the youth court’s decision to terminate parental rights was proper.
 

 Discussion
 

 ¶ 14. The party seeking termination of parental rights must prove grounds for termination by “clear and convincing evidence.”
 
 Santosky v. Kramer,
 
 455 U.S. 745, 769, 102 S.Ct. 1388, 1403, 71 L.Ed.2d 599, 617 (1982). The appellate
 
 *1267
 
 standard of review for youth court proceedings is the same as that which we apply to appeals from chancery court,
 
 In the Interest of S.C.,
 
 795 So.2d 526, 529 (Miss.2001) (citing
 
 M.C.M.J. v. C.E.J.
 
 715 So.2d 774, 776 (Miss.1998)); we will not disturb the trial court’s findings of fact where there is “credible proof from which a rational trier of fact may have found [grounds for termination] by clear and convincing evidence.”
 
 S.N.C. v. J.R.D.,
 
 755 So.2d 1077, 1080 (Miss.2000) (quoting
 
 Ethredge v. Yawn,
 
 605 So.2d 761, 764 (Miss. 1992)).
 

 ¶ 15. Mississippi Code Section 93-15-103(3) sets forth the grounds for involuntary termination of parental rights. The youth court determined that the following grounds warranted termination of A.B.’s and B.B.’s parental rights:
 

 (e) The parent exhibits ongoing behavior which would make it impossible to return the child to the parent’s care and custody:
 

 (i) Because the parent has a diagnosable condition unlikely to change within a reasonable time such as alcohol or drug addiction ... which condition makes the parent unable to assume minimally, acceptable care of the child; or
 

 (ii) Because the parent fails to eliminate behavior, identified by the child caring agency or the court, which prevents placement of said child with the parent in spite of diligent efforts of the child caring agency to assist the parent;
 

 Miss.Code Ann. § 93-15-103(3) (Rev.2004).
 

 ¶ 16. Regarding the “ongoing behavior,” the court specifically found that A.B. and B.B. had “a drug addiction, unlikely to change within a reasonable time.” The written judgment does not elaborate; but the trial judge stated from the bench, at the close of the termination proceedings, that the mother’s conduct on November 9, 2004, the “diluted” drug screens, and the refusal to provide a hair sample indicated the mother had an ongoing drug addiction:
 

 At the time the children were picked up, mom originally was involved in conduct concerning abuse of controlled substances and subsequently had a criminal conviction, put on probation, entered into a Service Agreement, completed the Service Agreement and managed to get her children back and the Court is convinced that she let herself slide back into the same category, doing the same things, because the same complaints of the same conduct were presented to DHS. When they intervened, they found her all but comatose in a trailer with a man not related to any of the children, half naked and unable to respond to people knocking on the door, children running loose in the home and soiled britches and one naked and her explanation, after being aroused by a Social Worker standing by the bed after hollering entering the household, was that she had just fed them breakfast at 2:00 P.M. and had laid down. Drug screens showing diluted, refusal to take a hair screen and I — I don’t belittle her the legal decision to refuse the hair screen, because the hair screen may have put her in problems with violating her probation and they would’ve sent her back to prison. But, that decision also affected these proceedings in that it showed her willingness or that is her unwillingness to cooperate. The hair sample would have given the Court indicators of present or past drug usage and the Court could’ve made some delineation as to whether it was before or after intervention by DHS.
 
 Without it, the Court can only assume that it is continued conduct as a result of the diluted drug screens.
 
 Even the policies now of
 
 *1268
 
 MDOC have changed that high creati-nine levels are an automatic indicator of tampered drug screens either due to over hydration or substance of tampering or taking internet ordered milk shakes and other substances that screw around with drug testing. They’re offered on the internet on a daily basis at, at least a hundred different sites and those who choose to exercise that privilege and use those sites and use those substances and
 
 the Court is not indicating that this particular mother did any of those things, she simply refused to cooperate, that it put this Court in a posture that it was ongoing, continued drug involved activity
 
 and the Court ordered the pursuit of Termination of Parental Rights and I entered that Order on December 30th, 2004....
 

 [A]s of December 30th, 2004, the mother,
 
 by her refusal to cooperate and provide drug screens
 
 as ordered by the Court, did indicate to the Court that it was on-going behavior that she chose not to change.
 

 (Emphasis added.)
 

 ¶ 17. After reviewing the record and transcripts, we cannot say that there was credible proof to support the youth court’s finding that the parents had an ongoing drug addiction. Two diluted urine samples and the refusal to submit to a hair screen may create suspicion, or perhaps even an inference of drug use; but this circumstantial evidence falls short of establishing such activity by “clear and convincing evidence.”
 
 Santosky,
 
 455 U.S. at 769, 102 S.Ct. 1388.
 

 ¶ 18. The youth court and the guardian ad litem relied heavily on A.B.’s refusal to submit to a hair test, but there is no documentary evidence in the record that A.B. was under any obligation to give a hair sample. A social worker testified that she had “been authorized by the Youth Court Judge to request a hair drug screen,” but there is no court order or other documentation in the record to confirm or even suggest that A.B. was legally required to provide a hair sample.
 

 ¶ 19. Notably, the youth court never acknowledged that the drug charges, which formed the basis for the December 30, 2004, finding of neglect, were later dropped because the substance turned out to be innocuous. The court also declined to consider that the mother had tested negative for drugs on more than one occasion subsequent to the neglect hearing. At the close of the termination proceeding, the trial judge stated:
 

 Regretfully, I cannot and have not considered any kind of evidence of the mother’s conduct, rehabilitation, if any, or anything else since that date, because any efforts to reunite, which were placed on the Department of Human Services, were removed the minute the Court ordered the termination — pursuit of termination' — TPR.
 
 I am put in the posture that my decision, based on the evidence before it, as of December 30th, 2001p, was an accurate reflection of the circumstances at that time, they warranted pursuit of Termination of Parental Rights.
 

 (Emphasis added.)
 

 ¶ 20. Mississippi Code Section 93-15-109 requires that a court consider
 
 “all
 
 the evidence” when determining whether termination of parental rights is warranted. Here, the youth court erred in failing to consider all the evidence of A.B.’s alleged drug usage, specifically that the charges against her had been dropped and that she had tested negative on subsequent drug screens. This is particularly troublesome considering that the trial judge indicated to the mother that she might regain custody of her children. At the close of the neglect hearing, A.B. asked whether there
 
 *1269
 
 was anything she could do to get her children back. The trial judge responded,
 

 I’m not telling you that it’s not possible but it’s just not that — I’m not the one that’s gonna tell you what you need to do, but when the TPR is filed, that’s a separate hearing. That comes here and I hear it, but it has a separate hearing and separate allegations that have to be met in order for the TPR to be granted and I don’t know what your status is gonna be when that happens.
 

 Yet, at the termination hearing, the trial judge refused to hear evidence contrary to that which had been presented one and a half years earlier at the neglect hearing.
 

 ¶ 21. While the Court of Appeals found sufficient evidence to support termination of parental rights, several of the facts relied upon by that court are incorrect or simply are not to be found in the record. For example, the Court of Appeals stated that “[t]he father, B.B., had been arrested on drug charges and was not present during the current termination of parental rights proceedings. Both parents have served time in prison on drug-related charges.”
 
 A.B. and B.B. v. Lauderdale County Dep’t of Human Servs.,
 
 14 So.3d 51, 55, 2008 Miss.App. LEXIS 365 at 16 (June 17, 2008). The opinion fails to mention that these charges were the same charges that were dropped because the substance did not test positive for methamphetamine. This is the only time the record reflects that the father was in jail, and there is nothing in the record to show that he was ever “in prison on drug-related charges.” Also, nothing in the record indicates that the mother actually served time for her previous possession conviction.
 

 ¶ 22. The Court of Appeals also stated, “[previously, A.B., the mother, was pulled over by the police with her children in the car. The police found a burner, police scanner, and a recipe for crystal methamphetamine.”
 
 Id.
 
 This suggests that the “burner,” the police scanner, and the recipe were found in the car with the children, but nothing in the record supports this conclusion. The only reference to these items was made by the social worker at the neglect hearing. According to the social worker, after the parents were incarcerated, someone found “a burner and a police scanner on the seat of [the father’s] truck and later when their belongings were moved to another location, there was a recipe for crystal meth found in their belongings.”
 

 ¶ 23. Additionally, the opinion states, “[an] officer testified that both A.B. and B.B. were still doing drugs,”
 
 Id.
 
 at 55, 2008 Miss-App. LEXIS 365 at 18. Such testimony is not in the record.
 

 ¶ 24. Finally, the only evidence before the youth court during the termination proceedings concerned the mother’s conduct. There was simply no credible evidence that the father, B.B., was currently using drugs. The only evidence of B.B.’s drug usage was elicited during the neglect hearing and was minimal at best. When asked about B.B.’s criminal record, the deputy sheriff responded, “his permanent history is clean ... but it won’t be for long.” From the context, it appears that the officer was referring to a pending charge, the same charge against A.B. that later was dropped. Current or recent drug use by either parent was not established by clear and convincing evidence.
 

 ¶ 25. Although the issue was not addressed by the Court of Appeals, the youth court also determined that termination of parental rights was warranted because of its previous adjudication of neglect. Under Section § 93 — 15—103(3)(h), parental rights may be terminated if:
 

 The child has been adjudicated to have been abused or neglected and custody
 
 *1270
 
 has been transferred from the childs parent(s) for placement pursuant to Section 43-15-13, and a court of competent jurisdiction has determined that reunification shall not be in the child’s best interest.
 

 Miss.Code Ann. § 93-15-103(3)(h) (Rev. 2004). However, neither the judgment nor the judge’s comments at the neglect hearing reflects a determination “that reunification shall not be in the ehild[ren]’s best interest.” To the contrary, the youth court ordered that the mother would have supervised visitation upon her release from jail. Also, as discussed above, the trial court indicated at the neglect hearing that A.B. might regain custody of her children. Therefore, the prior adjudication of neglect did not amount to a determination “that reunification shall not be in the child[ren]’s best interest,” as required by subsection (h).
 

 Conclusion
 

 ¶26. Because the grounds for termination were not established by clear and convincing evidence and because the youth court did not consider all of the relevant evidence, we reverse the Court of Appeals and the judgment terminating parental rights, and remand the case to the Lauder-dale County Youth Court for further proceedings consistent with this opinion.
 

 ¶ 27. REVERSED AND REMANDED.
 

 WALLER, C.J., CARLSON AND GRAVES, P.JJ., DICKINSON, RANDOLPH, LAMAR AND PIERCE, JJ., CONCUR. CHANDLER, J., NOT PARTICIPATING.
 

 [1]
 

 . Fictitious initials and pseudonyms are used for the parents and minor children, respec-lively.
 

 [2]
 

 . According to the deputy sheriffs present at the neglect hearing, A.B. was on probation for possession of methamphetamine. No documentation concerning her probation appears in the record.