# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-CA-00114-COA

**IN THE MATTER OF THE ADOPTION OF A**          **APPELLANT**
**MINOR CHILD NAMED IN THE COMPLAINT:**
**JUSTIN DANIEL HARMON**

v.

**KRYSTAL KATHLEEN INGLE AND SHAUN**          **APPELLEES**
**MITCHELL PERRY**

DATE OF JUDGMENT:                    12/28/2017
TRIAL JUDGE:                         HON. H. DAVID CLARK II
COURT FROM WHICH APPEALED:           SCOTT COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:              BRIAN DOUGLAS MAYO
ATTORNEY FOR APPELLEES:              P. SHAWN HARRIS
NATURE OF THE CASE:                  CIVIL - ADOPTION
DISPOSITION:                         AFFIRMED - 05/07/2019
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

## CONSOLIDATED WITH

## NO. 2018-CA-00116-COA

**IN THE MATTER OF THE ADOPTION OF A**          **APPELLANT**
**MINOR CHILD NAMED IN THE COMPLAINT:**
**JUSTIN DANIEL HARMON**

v.

**KRYSTAL KATHLEEN INGLE AND SHAUN**          **APPELLEES**
**MITCHELL PERRY**

DATE OF JUDGMENT:                    12/28/2017
TRIAL JUDGE:                         H. DAVID CLARK II
COURT FROM WHICH APPEALED:           SCOTT COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:              BRIAN DOUGLAS MAYO
ATTORNEY FOR APPELLEES:              P. SHAWN HARRIS

NATURE OF THE CASE:        ADOPTION

DISPOSITION:          AFFIRMED - 05/07/2019

MOTION FOR REHEARING FILED:

MANDATE ISSUED:

**BEFORE BARNES, C.J., TINDELL AND McCARTY, JJ.**

**BARNES, C.J., FOR THE COURT:**

¶1.      Justin Harmon and Krystal Ingle were married on April 6, 2006, and divorced by order of the Scott County Chancery Court on August 13, 2013.[1] Two children were born of the marriage: "Brian," born in September 2006, and "Jesse," born in March 2010.[2] The chancery court awarded Krystal sole legal and physical custody of the children. Because of Justin's history of drug and alcohol abuse, the court ordered him to enter an in-house rehabilitation program. Upon completion of the program, Justin would be granted supervised visitation with the children for sixty days, with unsupervised visitation thereafter, provided no additional incidents of alcohol consumption or abusive behavior occurred. The chancery court's order further provided: "[G]iven the history of alcohol abuse, the mother has the right to suspend visitation should she have viable, credible information that the father has resumed his alcohol abuse, or any drug abuse, or abusive behavior." Justin was ordered to pay child support of $250 a month.

¶2.      In February 2014, having completed a thirty-day drug and alcohol treatment program and having received supervised visitation for sixty days, Justin was allowed an unsupervised

---

[1] The couple separated in August 2012. During divorce proceedings, two temporary restraining orders were entered against Justin due to domestic violence that had occurred.

[2] Fictitious names are used to protect the minors' identities.

2

visit with the children. Brian's grandmother, Karen Ingle, had given him a cell phone, and he contacted his mother and grandparents that night to report that Justin was acting angry and drunk. According to Krystal, Brian initially called her to say that he was scared because Justin was driving erratically. He later reported that Justin had gone into a liquor store in Meridian, gotten into a fight with his girlfriend at the movies, and had lost the car keys. Brian also called her, saying that they were at a pond after dark with Justin and his girlfriend; Krystal could hear Jesse crying and Justin tell one of the children to "Shut the f*** up." Krystal contacted local law enforcement, who waited outside of Justin's mobile home that night. However, Justin and the kids stayed in Meridian with his girlfriend's family. Brian told Krystal that Justin was sick all day Saturday.

¶3.     After the kids returned home, Krystal decided to invoke the condition of the court's order and sent a text to Justin, telling him that future visits with the children would be cancelled due to his alcohol abuse and that he could contact her attorney. Shortly thereafter, Krystal and the children moved to Flora, Mississippi, with her boyfriend of several months, Shaun Perry. On May 11, 2015, Krystal and Shaun were married. On November 13, 2016, Krystal and Shaun filed petitions with the chancery court to adopt and for the termination of Justin's parental rights.[3]  A guardian ad litem (GAL) was appointed, and the parties were ordered to submit to urine and hair follicle testing for drugs by February 20, 2017. Krystal and Shaun immediately complied, with negative test results, but Justin waited until June 23,

---

[3] Separate petitions were filed for each child, which is why the cases on appeal have been consolidated. We note that in 2016, Krystal and Shaun had a child together.

2017, to comply with the court's order.[4]  The results of his hair-follicle test tested positive for methamphetamine.

¶4.     The GAL's report indicated that since moving to Flora, the Perry family regularly attended church together and that the minor children were happy, well-adjusted, and excellent students.  They also expressed a preference to use "Perry" as their last name at school. Letters from friends and family indicated that the boys loved Shaun and that Shaun treated them like they were his own children.

¶5.     Trial testimony revealed that Justin had not had any contact with the children for three years.  Although Justin claimed it had been a year since he used any drugs, a hair-follicle test conducted June 23, 2017, tested positive for methamphetamine.  Justin argued that he did not know how to get in touch with Krystal or the children; but testimony showed that Krystal had not changed her cell phone number, and her parents still lived and worked in the same location since her and Justin's marriage.  Krystal testified that Justin had sent her a text once, but he never requested to see the children during that time.  Krystal's mother also testified that Justin never contacted her to inquire about the children.

¶6.     Justin's mother, Janet Harmon, acknowledged that during supervised visitation, Justin would often leave to go out.  She related that during one visit, the children witnessed a physical altercation between Justin and his father.  Although she insisted that the boys were not afraid of Justin, she confessed that Brian was going to call 9-1-1 during the argument and she stopped him. There was also testimony that Justin had to be hospitalized for a drug

---

[4] Justin's dilatory conduct prompted the Perrys to file motions for contempt to enforce the court's order for drug testing.

overdose after the separation.

¶7. The GAL, Joseph Sims, testified that Shaun "is the only daddy that the youngest child knows and the only daddy that the older child, [Brian], really recognizes." He determined that although Justin was now willing and able to care for the children, there was no question that Justin had not contacted the children for over a year, which constitutes abandonment under Mississippi law. The GAL further noted that Justin had provided no financial support, which was due to a lack of steady employment likely because of drug and alcohol use. He opined that reunification with Justin would not be in the children's best interest.

¶8. On December 28, 2017, the chancery court terminated Justin's parental rights, finding that Justin "did not make reasonable efforts to attempt to visit and reestablish visitation with the minor children." The court also entered a judgment of adoption for each child.

¶9. Justin appeals, contending that Krystal interfered with his visitation and, therefore, the chancery court erred in terminating his rights. We find no error and affirm.

**DISCUSSION**

¶10. Although Justin concedes that he had not seen his children or paid child support for more than three years by the time of trial, he argues that his "abandonment" was due to Krystal's interference with his visitation. Justin claims he was not informed of their change in address, which violated the court's order. Therefore, he argues that his parental rights were wrongfully terminated, and he requests that this Court reverse the judgment and remand for reinstatement of his parental rights.

¶11. A chancery court's termination of a parent's rights is reviewed "under the manifest

5

error/substantial credible evidence test." *Blakeney v. McRee*, 188 So. 3d 1154, 1159 (¶13) (Miss. 2016). "[W]here there is credible proof from which a rational trier of fact may have found grounds for termination by clear and convincing evidence," the trial court's decision will not be disturbed. *Id*. (quoting *A.B. v. Lauderale Cty. Dep't of Human Servs.*, 13 So. 3d 1263, 1267 (¶14) (Miss. 2009)). The grounds for the involuntary termination of parental rights are set forth in Mississippi Code Annotated section 93-15-119, which provides in pertinent part:

(1) A court hearing a petition under this chapter may terminate the parental rights of a parent when, after conducting an evidentiary hearing, the court finds by clear and convincing evidence:

(a)(i) That the parent has engaged in conduct constituting abandonment or desertion of the child, as defined in Section 93-15-103, or is mentally, morally, or otherwise unfit to raise the child, which shall be established by showing past or present conduct of the parent that demonstrates a substantial risk of compromising or endangering the child's safety and welfare; and

(ii) That termination of the parent's parental rights is appropriate because reunification between the parent and child is not desirable toward obtaining a satisfactory permanency outcome; or

. . . .

(2) An allegation of desertion may be fully rebutted by proof that the parent

. . . .

(b) Was willing to provide financial support and to make visitations with the child, but reasonable attempts to do so were thwarted by the mother or her agents, and that the parent is now willing and able to assume legal and physical care of the child.

6

¶12. "Abandonment . . . includes 'any conduct by a parent which evinces a settled purpose to forego all duties and relinquish all parental claims to the child.'" *In re Adoption of Minor Child*, 931 So. 2d 566, 577 (¶29) (Miss. 2006) (quoting *Gunter v. Gray*, 876 So. 2d 315, 320 (¶21) (Miss. 2004)). "The test for abandonment is objective and requires a finding that, under the totality of the circumstances, 'the natural parent has manifested his severance of all ties with the child.'" *Id*. Krystal testified that Justin never contacted her regarding visitation with the children; he only left her one voicemail in 2015 asking if the kids could go see his ailing grandfather.

> Q.    Okay.  But he's never asked you about making arrangements to visit with the children?
>
> A.    No, sir.
>
> . . . .
>
> Q.    Have you received any child support payments?
>
> A.    No.  The last one I received was dated for January 2014.

The chancery court concluded in its orders that there was clear and convincing evidence that Justin had not made any "reasonable efforts" to visit the children.  At trial, Justin claimed that he tried to call Krystal, but she did not answer; so he assumed she had changed her number and "didn't see the point in continuing."  However, he admitted that he never tried to text her.  Justin also knew where Krystal's parents lived and worked.   As the chancellor noted in his findings, even if we find all of Justin's testimony credible, "it would be that he made two or three phone calls, [his uncle] made two or three phone calls, his mom and dad talked to [Krystal's dad] and that's about it."

7

¶13. The testimony also showed that Justin had little to no relationship with his youngest son. At trial, Justin was not even certain of Jesse's date of birth and admitted his youngest son would likely not recognize him. Justin's relationship with his older son, Brian, was strained at best because Brian was a witness to his alcohol abuse and anger outbursts. Krystal testified: "A kid should not see their parent punch a bedroom door and have their hand come out on the other side trying to get to their mom. . . . [Brian] has no good memories of being a kid, and it's because I stayed [with Justin]." Krystal cancelled a supervised visitation during the couple's separation because Brian had hives, which were caused by stress, and she opined that if the boys had to resume visits with Justin, "it would destroy them." Justin confessed that he used methamphetamine for a couple of years during the divorce, and the evidence of his drug test showed positive results for methamphetamine in 2017.

¶14. At trial, the chancellor expressly rejected Justin's argument that Krystal interfered with his visitation, finding:

> When [Krystal] left in 2014, she did not do so, in the opinion of the [c]ourt by clear and convincing evidence, with the intent of forever and permanently severing the relationship between these children and Justin. She did so in an attempt to protect them and convince him to get his life in order.

He also found that the evidence showed that Justin "willfully neglected and refused to provide any support for those children." We find substantial and credible evidence to support the chancellor's findings. Krystal acknowledged that she did not notify Justin of her new address but explained that she "was scared because [she] knew his anger outbursts and his problems" and that she "was just trying to be safe and protect my kids." She checked Justin's

8

Facebook page occasionally to see how he was doing, but because he never contacted her regarding the children, she "assumed that he hadn't gotten any better." Krystal said she was surprised that Justin never made any attempt to try to resume visitation.

Q.      Were you trying to hide the boys from Justin?

A.      No.  Like I said, I genuinely, in my gut, thought that, especially as much financial and legal help that Randy and Janet had with Justin, that they were going to file some sort of paperwork[,] and I would be able to get him to go back to rehab so he could get clean again so we could do supervised visits again so we could start the whole process over again.  I didn't know he would just drop it.

The GAL's report acknowledged that Krystal kept the children from Justin, but did so for their safety and well-being, noting:  "Krys[tal], I think, tried to sever all ties with Justin because of their past history, with his violence and drug/alcohol abuse."  However, the GAL further observed that neither Justin nor his family members "took any of the necessary steps to become a part of the children's lives."  The GAL concluded that it was in the children's best interest for Justin's parental rights to be terminated and for Shaun to be allowed to adopt the boys.  Justin does not dispute the GAL's factual findings.

¶15.    Furthermore, the evidence was undisputed that Justin provided no financial support for the children since February 2014.  The chancery court observed:

If he were willing to provide financial support, he would have come into court and said, "Here's the bank statement from the local bank where I set up a savings account for my children, and here's the money." . . . Instead what he said was he didn't work very often, . . . he didn't have the money to pay the child support.

As the GAL testified, Justin, who had a commercial driver's license, did not work regularly after the divorce, and the attributing cause of his lack of employment was his abuse of drugs

9

and alcohol.

¶16.   Because there was clear and convincing evidence that Justin made no serious effort to see his children or to provide financial support for them from 2014 to 2017, we find no manifest error in the chancery court's determination that he had engaged in conduct constituting abandonment and that it would not be in the children's best interest to be reunified with their natural father.  Accordingly, we affirm the court's orders to terminate Justin's parental rights and to grant the petitions for adoption.

¶17.   **AFFIRMED.**

   **CARLTON AND J. WILSON, P.JJ., GREENLEE, WESTBROOKS, TINDELL, McDONALD, LAWRENCE, McCARTY AND C. WILSON, JJ., CONCUR.**