DICKINSON, Presiding Justice,
for the Court:
¶ 1. The Hinds County Youth Court found that three-year-old J.T. had been sexually abused by her father, based on a statement she made which could describe either sexual abuse or innocent contact between a father and daughter. Because the State produced no evidence to show that the child’s facially ambiguous statement described abuse, and because the youth-court judge openly and admittedly disregarded the Mississippi Rules of Evidence throughout the adjudication, we reverse and remand.
FACTS AND PROCEDURAL HISTORY
¶ 2. On October 30, 2014, a daycare ■ teacher contacted the Mississippi Department of Human Services (DHS). The record does not reveal who received the teacher’s call and contains no memorialization of the call itself. According to the youth-court intake order, which first documented the report, the teacher informed DHS that three-year-old J.T. “told her teacher ... that dad put his fingers in her,” and that J.T.,“pointed at her vagina.”
¶ 3. DHS initiated an investigation; Cir-by Scott, a DHS family-protection specialist, spoke with.J.T.’s mother — M.T.—who stated that she knew of no abuse. Scott also spoke to J.T.’s father — D.T.—who denied the allegations. Scott permitted J.T. to remain in her • mother’s custody but required D.T. to leave the home and have no contact with J.T.
¶ 4. Scott then set up a medical examination with the Children’s Justice Center (CJC), which' discovered no physical evidence of abuse. Scott also referred the matter to the Children’s Advocacy Center (CAC) for a forensic interview, but the CAC declined because J.T. had been questioned and videotaped by the daycare center about her statement.
¶ 5. On November 3, 2014, the Hinds County Prosecuting Attorney filed a petition in the Hinds County Youth Court, seeking to adjudicate J.T. a sexually abused child. Two -days later, the youth court held a shelter hearing, at which Scott detailed the DHS investigation. Based on the information provided, the youth court determined that it had jurisdiction and that probable cause existed that J.T. had been sexually abused. The youth court ordered DHS to continue its investigation, that a forensic interview be conducted, and that D.T. have no contact .with J.T. The court also appointed an investigative guardian ad litem.
¶ 6. On November 10, 2014, the youth court held a second shelter hearing because the forensic interview results had been provided. Scott testified that, during the forensic interview, J.T. had made a statement similar to the one reported by the school. So the youth court left its prior orders'in force.
¶ 7. On December 30, 2014, the case proceeded to adjudication. The State first called Scott, who testified that she had observed J.T. state that D.T. “touched her in her booty” during the forensic interview. Scott explained that J.T. “pointed to the pictures showing that her booty was *1194 her, vaginal area.” Seott reported that J.T. also disclosed that she had been touched by a friend at school.
¶ 8. Scott testified about J.T.’s medical examination and explained — based on the doctor’s report and Scott’s conversation with the doctor — that the examination had produced no physical evidence of abuse. The CJC medical-examination report and the CAC forensic-interview report were then admitted in evidence over the parents’ hearsay and Confrontation Clause objections.[1] The CJC report concluded that J.T.’s “physical exam today was normal, which neither confirms nor denies previous maltreatment. .It is important to remember that many forms-of sexual contact do not leave physical evidence. In the rare cases where there' is injury, the body is often able to heal genital injuries without scar.”
¶ 9. The CAC forensic-interview report concluded that J.T. had “disclosed that her father touched her genital area and buttocks with his finger under her clothes one time in her parents’ bedroom. The interviewer was unable to determine the contexts of these touches.” The report further explained that J.T. stated that her father had touched her once, then had pulled up her pants and told her to go in the kitchen with her mother. When asked why her father touched her, J.T. responded that he got a “tiny cat” out of her “booty.” ,
¶ 10. S.cott also relayed her conversations with M.T. Scott testified that J.T.’s mother had told her that J.T, had once mentioned someone poking a finger in her booty, but that J.T. then had said this wasn’t true. She testified that the mother never expressed concern that D.T. may have done something wrong, but. she feared that something could have occurred at school.
¶ 11. Scott also explained that she had talked to D.T., and that he had denied the allegations. She held a meeting with various friends and family members, who also denied the allegations. Scott recalled that, during the family meeting, D.T. said he remembered J.T. commenting that he had poked her while he was helping her get dressed, but that this was “more like a poke with his fingernail.” Scott testified that the family has no prior history with DHS.
¶ 12. Finally, Scott testified that J.T. had been seeing a licensed counselor while this case was pending, and that the counselor reported that J.T. never had mentioned sexual contact and had shown no sexually inappropriate play during her sessions. Based on this information, Scott recommended that the youth court adjudicate J.T. a sexually abused child and maintain the no-contact order against her father.
¶ 13. Next, the State called Shaquita Jones, who works as an investigative guardian ad litem for the Mississippi Youth Court Guardians for. Justice in Hinds County, ■ She and the other investigative guardian ad litem for Hinds County — Keisha Graham — performed an investigation. Through Jones’s testimony, the State admitted the investigative guardian ad litem report in evidence over the parents’ hearsay objection.
*1195 ¶ 14. The report reiterated that both D.T. and M.T. had denied the allegations. Both suggested that this was all based on a misunderstanding. The report confirmed the statement made during the forensic interview,, and that the interviewer could not determine the context of the touching. The. report noted that the physical examination was normal and disclosed that the guardian ad litem had spoken with the parents’ attorney, and that- he had stated this allegation centered on a misrepresentation of what the child actually said in the school’s videotaped interview.
¶ 15. The report revealed that potential criminal charges would be presented to a grand jury, and that no allegations had been revealed to J.T.’s counselor. Finally, the report noted that M.T. had remained in the parking lot after the forensic interview for an hour, reading to J.T. and talking on the telephone. Based on this information, the report recommended that J.T. be adjudicated a sexually abused child. At this point, the State rested and J.T.’s attorney declined to call any witnesses.
¶ 16. The attorney for J.T.’s parents then called D.T. to testify. D.T. testified that J.T. is an outgoing and-very sociable threé-year-old. He also testified that J.T. is very imaginative and “you can’t take everything she says at face value.” He explained that on a typical morning, M.T. would make breakfast, and he would help the children get dressed. He also was the parent who usually bathed the children. When asked if he could explain her statement at the school, D.T. stated that he gets her dressed every day, which includes helping her put on her underwear and helping her clean herself as she goes through potty training.
¶ 17. He stated that because he has this much close contact with his daughter “I’m not surprised that she would go to daycare and say that I touched her in her bottom, but it wasn’t a sexual comment, and if it was taken that way, it was misunderstood.” D.T. also stated that J.T. had told her mother after the forensic interview that she was talking about D.T. “pulling her panties up and poking her with [his] finger by accident.” D.T. admitted that he did not suggest this misunderstanding when he first spoke with Cirby Scott. He testified that he never has and never would harm his daughter in any way. He also stated that he believed that it was in J.T.’s best interest for the family to be reunited.
¶ 18. Next, J.T.’s mother testified. She agreed with D.T.’s assessment of J.T.’s imaginative personality. She explained that sometimes she struggles to determine whether J.T. is talking about something that actually happened, something that someone told her, or something that she saw on television. She testified that J.T. had never reported to her that her father had done-anything wrong to. her.
¶ 19. She also described how hurt J.T. has been by being separated from her father. She testified that they have had ongoing issues with the daycare center. She gave her opinion that J.T. had been exposed to something inappropriate at day care, and that she had contacted a therapist about those concerns. She testified that she had never had any concern that her husband would do something like this, and that J.T. trusted him, felt safe around him, and had never acted scared around him or any other man. She believed that if something like the allegation had happened, J.T. would have told her and' other people she trusts in her family. She testified that there were times D.T. would help J.T. get dressed, when she was not around.
¶20. Next, D.T.’s. brother testified and explained that he had never seen a more loving relationship between father and daughter than that between D.T. and J.T. *1196 He testified that D.T. would never do anything to harm J.T. He stated that J.T. had never complained to him about D.T.' He testified that he was 100-percent certain D.T. did not abuse his daughter. He also testified that J.T. had never indicated to him that she had been exposed to sexual matters of ahy kind. He explained that all of the forty or so family- members and friends who attended the family meeting with DHS wanted to protect J.T. if something inappropriate had happened, but that J.T. had not given any of them reason to believe D.T. had done something wrong.
¶ 21. Finally, D.T.’s first cousin testified. She explained that she had spent significant time with J.T. since this matter had arisen, because she kept J.T. so the rest of the family could get together without violating the no-contact order. She testified that, during that time, J.T. had never said anything to suggest that D.T. had abused her. «She also explained that' D.T. is a gentle, patient, and kind father, and that she had never seen him do anything inappropriate with his child.
¶ 22. Based on this evidence, the youth court adjudicated J.T. a sexually abused child. The judge left her in her mother’s custody, and ordered that she receive counseling as needed. The court ordered DHS to continue to monitor the case and allowed visitation with D.T. at DHS. The youth court also ordered that the family go to counseling together and indicated that when the counselor recommended that it was safe to reunify the family, the youth court would enter an order to that effect. Otherwise, the no-contact order was left in place. J.T.’s parents appealed.
ANALYSIS
¶ 23. On appeal, J.T.’s parents primarily claim that the State has failed- to prove that J.T. was sexually abused. But, even if the State produced sufficient evidence, the parents argue that the State’s case rested entirely on inadmissible hearsay— which also violated their right to confront witnesses — and the improper expert testimony of unqualified witnesses. We find that the State failed to produce sufficient evidence to prove that J.T. had been sexually abused.
I. The State’s Evidence
¶ 24. Preliminarily, the parents point out that the judge’s order adjudicating J.T. a sexually abused child incorrectly states that “none of the parties present disputed the veracity of the allegations contained in Count 1.” The order gave no other reason to adjudicate J.T. a sexuahy abused child, and the parents point out that they strongly opposed the allegation, presenting witnesses and argument to the contrary.
¶ 25. But we also note that the judge made a ruling from the bpnch,-and that his ruling explicitly relied , on the evidence presented to resolve the disputed issue. Further, this Court reviews the youth-court judge’s ruling by the same standard that it reviews a chancellor’s ruling.[2] And this Court has said that “[t]he chancellor will be affirmed where he reaches a result correct under the law and the facts, even though a wrong reason be assigned.”[3] So the error in the judge’s written adjudication does not affect the outcome of this appeal. The relevant inquiry is whether, based on evidence in the record, he reached the correct result,
*1197 ¶ 26. The judge adjudicated J.T. a sexually abused child. The Mississippi Youth Court Act requires the State To prove by a preponderance of the evidence that a child has been sexually abused for this finding, to be made.[4] When reviewing the evidence, the youth-court judge ruled, “this Court considers all the evidence before the Youth Court in the light most favorable to the State.”[5] “If the evidence so considered is opposed to the finding of the Youth Court with such force that ‘reasonable men’ could not have found as the Youth Court did by a preponderance of the evidence, this Court must reverse.”[6] ■ ¶ 27. The Youth Court Act defines sexual abuse as:
obscene or pornographic photographing, filming or depiction of children for commercial purposes, or the rape, molestation, incest, prostitution or other such forms of sexual exploitation of children under circumstances which' indicate that the child’s health or welfare is harmed or threatened.[7]
Here, the State’s case relied entirely on the child’s statement. Three-year-old J.T. told her teacher and the CAC forensic interviewer that her father had stuck his finger inside her one time to get a “tiny cat” out of her “booty.” The child also indicated that “inside her” referred to her vagina.
¶ 28. Beyond the child’s statement, neither DHS nor the investigative guardian ad litem discovered any evidence of abuse during their respective investigations. The CJC performed a medical examination but discovered no evidence of sexual abuse. While the forensic interviewer obtained a statement from J.T. consistent with the statement reported to DHS, she stated she ■ could not determine whether the touching was sexual in nature.
¶ 29. DHS met with approximately forty family members and friends, and everyone indicated that J.T. had neither done nor said anything to suggest that she had been abused by her father. They all believed that D.T. would never do' anything like that. Two of them, D.T.’s brother and cousin, ’ testified during the ' adjudication and made the same statements. Further, J.T.’s mother testified that if something like the allegation had happened, J.T. would have told her or another family member she trusted.
¶ 30. D.T. consistently denied that he had sexually abused J.T. He offered — both in' his meeting with DHS and during the adjudication — an alternative explanation for the child’s statement. He explained that he helps J.T. dress, and that J.T. has been potty training, both requiring him to have close contact with J.T., including helping her clean herself after, using the restroom. D.T. even testified that J.T. had told her mother that her statement referred to a time when D.T. had helped her pull up her underwear and accidentally had'poked her.
¶ 31. We recognize that many abuse cases lack smoking-gun-type evidence, particularly when dealing with sexual abuse, which occurs predominantly in private. We also recognize that the CJC’s failure to find physical evidence does not preclude the possibility that abuse occurred. And we further recognize that, under some circumstances, a child’s statement alone may provide sufficient evidence to support a sexual-abuse adjudication.
*1198 ¶ 32.- But this child’s statement, could describe either sexual abuse or innocent contact between a father and daughter, and no additional evidence .was provided to show abuse. • The parents denied the allegation and provided an innocent explanation. And every witness interviewed by' DHS indicated that no abuse had occurred. Under these unique circumstances, the child’s statement did not provide sufficient evidence to support the abuse adjudication.
¶ 33. In E.S. v. State, this Court affirmed a finding of sexual abuse based largely on the child’s statement.[8] In that case, this Court explained that the minor child had “stated that she had been abused by her father on numerous occasions,”[9] while both the father and mother testified that no abuse had occurred, and the child’s sister disclaimed that she had been abused.[10] But J.T. did not provide a clear statement “that she had been abused by her father,” as had the child in E.S. And there, a clinical psychologist had opined that the child had been abused.[11] Here, the forensic interviewer could not provide a'similar conclusion.
¶ 34; Similarly, in In re D.O., a sexual-abuse adjudication relied heavily on the child’s statements.[12] But there, medical evidence had indicated that the child had been abused.[13] Here, the medical examination provided no evidentiary support for the judge’s decision.
¶35. In In re A.R., the youth court adjudicate;! two children physically abused, and this Court reversed based on insufficient evidence.[14] The children’s father reported that the children had returned from visitation with their mother with bruises on their buttocks.[15] The mother explained that the boys had received a spanking for trouble at school.[16]
¶ 36. This Court first explained that the Youth Court Act does not prohibit the use of all corporal punishment, but rather, that the youth court must assess the reasonableness of the parents’ actions to determine whether the conduct crossed the line from punishment. to abuse.[17] The Court then explained why the evidence was insufficient to show that the mother’s conduct fell on the impermissible side of that line:
The social worker did not interview the boys’ school teacher who had .reported the behavioral problems to the mother and step-father nor did she review the boys’ school, records; she did not interview the mother or step-father or examine the home environment of the boys; the social worker did not talk to the medical doctor who examined the boys for evidence of child abuse; she did not look at the belt or belt-like strap used in the discipline of the boys; the social worker did not have the boys tested or evaluated by experts; nor does the record contain any medical records showing evidence of physical abuse.[18]
In essence, the Court held that the initial evidence of abuse — -the boys’. bruises— *1199 could be consistent either with abuse or with innocent conduct, so the youth court needed additional evidence to determine that the children were abused.
¶ 37. Here, we face a similar situation. As in A.R., the initial evidence could describe abuse, but also innocent contact. J.T.’s statements all indicated that her father put his finger inside her one time. Both during the DHS investigation and the adjudication, the father explained that he helped J.T. dress for school, and that he had to help J.T. clean herself after using the restroom while potty training. He even testified that J.T, had told her mother that she was describing a time he accidentally poked her while pulling up her pants.
¶ 38. So J.T.’s statement could describe innocent contact.. But, unlike A.R., an investigation was performed in this case. That said, the investigation uncovered no additional evidence of abuse.
¶ 39. In A.R., the Court said that the investigator “did not interview the mother or step-father.” Here, the DHS worker interviewed J.T.’s parents, but neither suggested that J.T. had been abused. In A.R., the Court stated that the investigator “did not talk to the medical doctor who examined the boys for evidence of child abuse.” Here, the DHS worker did speak with the CJC doctor and provided his report, ' but the examination uncovered no evidence of abuse. In A.R., the Court said that the investigator did not have the boys tested or evaluated by'experts/ Here, the CAC performed a forensic interview, and the interviewer could not determine whether any abuse had occurred.
¶ 40. In other words, the A.R, Court found that the State had presented insufficient evidence when the initial evidence was susceptible to innocent and culpable interpretations, and no further investigation was performed. Our result cannot be different when the initial evidence was susceptible to . innocent and culpable interpretations, and the investigation, though thoroughly conducted, produced no evidence of abuse.
' ¶ 41. In sum', the State’s case rests entirely on a 'three-year-old’s statement that her father put his finger inside her. The father provided an innocent explanation for the statement. While J.T.’s statement might describe abusé, it also might describe innocent contact between a father and daughter. The State bore the burden to prove that abuse was more likely, and, under' this Court’s decision in A.R., it failed to meet that burden, because its only evidence might describe either innocent or culpable conduct.
¶ 42. The youth-court judge repeatedly commented that it was his job to protect children, and we certainly can understand why. But, this Court’s precedent does not permit the judge to adjudicate abuse out of caution, unless the evidence supports that adjudication. So we find that the youth court’s adjudication was not supported by sufficient evidence, and we reverse and remand.
II. The Judge’s Evidentiary Rulings
¶ 43. J.T.’s parents also appeal the youth court’s decision to ’ admit various hearsay and opinion testimony’ Because we reverse and remand based on the sufficiency of the evidence, we need'not address the parents’ particular evidentiary objections, nor their arguments regarding the Confrontation Clause. That said, both in the youth court and on appeal, the parties have argued, over the extent to which the Mississippi Rules of Evidence apply in youth-court proceedings. In the youth court, both the State and the judge adopted the view that the . Rules of Evidence are “relaxed.” Because that view— *1200 although incorrect — does have some support in our precedent, we find it necessary to clarify that the Rules of Evidence do apply in youth-court-adjudications with full force and effect.
¶ 44. Mississippi Rule of Evidence 1101(a) states that “these rules apply to all actions and proceedings in the courts of the State of Mississippi.” Rule 1101(b) excepts certain proceedings from the Rules’ broad applicability:
Proceedings for extradition or rendition; probable cause hearings in criminal cases and youth court cases; sentencing; disposition hearings; granting or revoking probation; issuance of warrants for arrest, criminal summonses, and search warrants; and proceedings with respect to release on bail or otherwise.[19]
Because Rule 1101(a) applies the Rules to all proceedings unless otherwise provided, and Rule 1101(b) does not except youth-court adjudication hearings, the Rules apply.
¶ 45. Mississippi Rule of Youth Court Practice '24(b)(3)(ii) confirms this view, stating' that “Adjudication hearings shall be conducted ... under the rules of evidence and rules of court as may comply with constitutional standards.” Also, Mississippi Rule of Youth Court Practice 24(b)(5)(H) states “[i]n arriving at its adju-dicatoiy decision, the court shall consider only evidence which has been formally admitted at the adjudicatory hearing. The following evidentiary procedures apply to these hearings ... the court shall admit any evidence that would be admissible in a civil proceeding.”
¶ 46. The Mississippi Youth Court Act provides similar guidance. Mississippi Code Section 43-21-203(4) states that, in youth court, “[a]lT- hearings shall be conducted under such rules of evidence and rules of court as may comply with applicable constitutional standards.”[20] Likewise, Section 43-21-559 states that “[i]n proceedings to determine whether a child is a neglected child or an abused child, the youth court shall admit any evidence that would be admissible in a civil proceeding.”.[21]
¶ 47. So both the rules of court and the Mississippi Code dictate that the Mississippi Rules of Evidence apply to abuse adjudications in youth court. This Court’s precedent confirms that view. “The evidence of abuse ■ by the father consisted entirely of hearsay testimony of statements allegedly made by the child. To admit the hearsay statements of the child the trial court, the youth court in this case, must. determine whether the testimony falls- within any of the hearsay exceptions enumerated in M.R.E. 803.”[22]
¶ 48. Section 43-21-603(2) of the Youth Court ’ Act does state “[t]he court may consider any evidence that is material and relevant to the disposition of the cause, including hearsay and opinion evidence.”[23] But the Court must recognize this provision’s context. Section 43-21-601 states:
(1) If the child has been adjudicated a delinquent child, a child in need of supervision, a neglected child or an abused child, the youth court shall immediately set a time and place for a disposition hearing which .shall be separate, distinct *1201 and subsequent to the adjudicatory hearing. The disposition hearing, however, may be held immediately following the adjudicatory hearing unless a continuance is necessary to allow the parties to prepare for their participation in the proceedings.[24]
Section 43-21-603, which the youth court cites, then states:
(1) At the beginning of each disposition hearing, the judge shall inform the parties of the purpose of the hearing.
(2) All testimony shall be under oath unless waived by all parties and may be in narrative form. The court may consider any evidence that is material and relevant to the disposition of the cause, including hearsay and opinion evidence. At the conclusion of the evidence, the youth court shall give the parties an opportunity to present oral argument.[25]
In other words, hearsay and opinion evidence may be considered in disposition hearings, the youth-court equivalent of adult sentencing hearings. This comports with Mississippi Rule of Evidence 1101(b), which includes sentencing and disposition hearings in its exceptions to the Rules’ applicability. This case deals with an adjudication, not a disposition hearing.
¶ 49. In the past, however, this Court has used .language suggesting that Section 43-21-603 applies more broadly. In In re T.L.C., this Court stated, without citation to authority, that “[traditionally rules of evidence have been relaxed in youth court proceedings.”[26] The Court then stated, citing Mississippi Rule of Evidence 1101(b)(3), that “[b]y express provision, the Mississippi Rules of Evidence are not in force.”[27] But, as discussed above, Rule 1101(b)(3) exempts only youth-court probable cause and disposition hearings, not adjudications. Likewise, in In re R.D., this Court stated that “[t]he Youth Court Act thus clearly contemplates that strict adherence to our rules of evidence will not be required, and indeed, concerns over hearsay evidence and the like are basically dismissed.”[28] But this language was prefaced by the Court’s statement that “Miss. Code Ann. § 43-21-603 indicates that at youth court hearings, to determine the disposition of a child- adjudicated as neglected, traditional rules of evidence simply do not apply.”[29]
¶ 60. In In re T.B., the Court of Appeals incorporated into its standard, of review when reviewing the sufficiency of the evidence in an adjudication.[30] the statements “[regarding the propriety of evidence, the Youth Court Act provides that ‘[t]he court may consider any evidence that is material and relevant to the disposition of the cause, including hearsay and opinion evidence’ ” and “[t]he Youth Court Act implies that strict adherence to our rules of evidence is not required, and that, ‘concerns over hearsay evidence and the like are basically dismissed.’ ”
¶ 51. To the extent that this Court or the Court of Appeals has held that the Mississippi Rulés of Evidence have some diminished force in youth-court adjudicar *1202 tions, we overrule the cases. When the youth court adjudicates the ultimate issue of abuse, the Rules must be given full effect.
¶ 52. We agree with the youth court’s assertion in its supplemental brief that, in conducting .its proceedings, the youth court must remain cognizant of the child’s best interests. But the primary purpose of the Rules of Evidence is to exclude unreliable evidence, and we must reject the notion that a child’s best interests are served when youth-court judges use unreliable evidence to adjudicate children as abused or delinquent.
¶53. This Court does not arbitrarily adopt the rules that control the admission of evidence in our courtrooms. Over time — with substantial input from the bench and bar, and borrowing much from the Federal Rules of Evidence — we have refined our rules to ensure that trials are decided based on reliable evidence. To suggest that the Rules should be “relaxed” in youth court is to suggest that a child’s best interests are served when youth-court judges base their decisions on unreliable evidence. The concurring opinion falls victim to this flawed reasoning.
¶ 54. We think it important to point out that, while the concurring opinion suggests that the Rules ' should be “relaxed” in youth court, it points tó no particular rule that should be relaxed. Even where hearsay fits none of the Rule 803 or Rule 804 exceptions, Rule 803(24). allows a trial judge, including a youth-court judge, to admit it, provided the trial judge finds the evidence to have particular indicia of reliability. We cannot agree that the Rules of Evidence should be relaxed to allow hearsay that fits no exception, and that a trial judge cannot verify as reliable.
¶ 55. To be clear, a child’s best interests are served when adjudication decisions are based upon reliable evidence. The Rules — including Rule 803(24) and Rule 803(25) — have been crafted to facilitate that endeavor and have afforded trial judges substantial discretion where it serves that purpose.
¶ 56. The concurring opinion correctly points out that specific rules have been promulgated by this Court to govern youth-court proceedings. And we agree that, where those specific provisions depart from the Mississippi Rules of Evidence, the specific youth-court rule applies. But where no specific youth-court rule su-percedes the Mississippi Rules of Evidence, the Rules apply with full force and effect, and neither the Rules of Evidence, nor the Uniform Youth Court Rules allow ad hoc amendment by trial judges.
CONCLUSION
¶ 57. Because the State produced insufficient evidence to support the youth court’s adjudication, we reverse and remand for proceedings consístént with this opinion. We also affirm that, except where specifically superseded by a youth-court-specific rule, the Mississippi Rules of Evidence apply with full force and effect’to youth-court' adjudications.
¶ 58. REVERSED AND REMANDED.
WALLER, C.J., LAMAR, KITCHENS, KING AND COLEMAN, JJ., CONCUR. MAXWELL, J., CONCURS IN PART AND IN RESULT WITHOUT SEPARATE WRITTEN OPINION. BEAM, J., CONCURS IN PART AND IN RESULT WITH SEPARATE WRITTEN OPINION JOINED BY RANDOLPH, P.J.; WALLER, C.J., AND MAXWELL, J., JOIN IN PART.

. J.T.’s attorney also moved to introduce a report by the investigatory guardian ad litem through Scott’s testimony. This report was subject to the same objections, and the judge withheld ruling on that report's admission until the investigative guardian ad litem had testified. Also, when J.T.’s attorney moved to admit the CJC, CAC, and guardian ad litem reports, she failed to mention Scott’s DHS report. But the attorneys repeatedly referenced that report while questioning Scott, and the judge referenced it in his ruling, despite the fact that it was never admitted in evidence,

. In re B.S., 105 So.3d 1120, 1121-22 (Miss.2013) (quoting A.B. v. Lauderdale Cty. Dep’t of Human Servs., 13 So.3d 1263, 1266-67 (Miss.2009)).

. Tedford v. Dempsey, 437 So.2d 410, 418 (Miss.1983) (citing Huffman v. Griffin, 337 So.2d 715, 723 (Miss.1976)).

. Miss.Code Ann. § 43-21-561(3) (Rev.2015).

. Collins v. Lowndes Cty. Pub. Welfare Dep't, 555 So.2d 71, 72 (Miss.1989) (citing In re M.R.L., 488 So.2d 788, 791 (Miss.1986)).

. Collins, 555 So.2d at 72.

. Miss.Code Ann. § 43-21-105(n) (Rev.2015).

. E.S. v. State, 567 So.2d 848, 849 (Miss.1990).

. Id.

. Id.

. Id.

. In re D.O., 798 So.2d 417, 421 (Miss.2001).

. Id. at 422.

. In re A.R., 579 So.2d 1269, 1270-71 (Miss.1991).

. Id. at 1270.

. Id.

. Id. at 1270-71.

. Id. at 1271.

. (Emphasis added.)

. Miss.Code Ann. § 43-21-203(4) ■ (Rev. 2015).

. Miss.Code Ann. § 43-21-559 (Rev.2015).

. In re C.B., 574 So.2d 1369, 1371-72 (Miss.1990) (citing Mitchell v. State, 539 So.2d 1366, 1369 (Miss.1989)).

. Miss.Code Ann. § 43-21-603(2) (Rev. 2015). '

. Miss.Code Ann. § 43-21-601 (Rev.2015).

. Miss.Code Ann. § 43-21-603 (Rev.2015) (emphasis added).

. In re T.L.C., 566 So.2d 691, 700 (Miss.1990).

. Id. (citing Miss. R. Evid. 1101(b)(3)).

. In re R.D., 658 So.2d 1378, 1391 (Miss.1995).

. Id. at 1390 (emphasis added).

. In re T.B., 909 So.2d 131, 133 (Miss.Ct.App.2005) (citing Miss.Code Ann. § 43-21-603(2) (2004); In re R.D., 658 So.2d at 1391).