# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2019-CA-01654-COA

**MICHAEL SMITH**                                                        **APPELLANT**

**v.**

**KATIE DOE**                                                              **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 10/04/2019 |
| TRIAL JUDGE: | HON. SHEILA HAVARD SMALLWOOD |
| COURT FROM WHICH APPEALED: | FORREST COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | CHARLES E. LAWRENCE JR. |
| ATTORNEY FOR APPELLEE: | SHAWN M. LOWREY |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED - 03/30/2021 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

### BEFORE CARLTON, P.J., GREENLEE AND McDONALD, JJ.

### McDONALD, J., FOR THE COURT:

¶1. This appeal arises from the termination of Michael Smith's parental rights by the Forrest County Chancery Court on the ground of Smith's abandonment of his biological minor child, Matthew.[1]  Michael appeals, claiming that the proof showed that he did not abandon Matthew.  Finding that there was clear and convincing evidence to support the chancery court's ruling, we affirm.

### Statement of the Facts and Procedural History

---

[1] To protect the interests of the child, and for the ease of reference, the Court of Appeals has replaced the names of the parties and witnesses involved in this case with fictitious names.

¶2.    Michael Smith[2] and Katie Doe met while attending college and formed a relationship. When Katie became pregnant in 2011, Michael and Katie decided to move into an apartment together. Michael accompanied Katie to prenatal appointments. Their son, Matthew, was born on February 15, 2012. Michael and his mother, Dr. Danielle Smith, were present when Katie gave birth to Matthew. Katie and Michael continued living together until June 2012, when their relationship ended because of a dispute regarding Michael's mother. According to Michael, Katie wanted him to move out of the apartment. When he refused, Katie took Matthew and moved into her parents' house. Michael moved into a new apartment complex. He asked Katie to move in with him, but she refused because she did not want go against her father's wishes.

¶3.    During July 2012, Katie and Michael met on two occasions to discuss Michael's visitation schedule with Matthew. But arguments ensued, and the two came to no resolution regarding Michael's visitation. From July 2012 to December 2012, Michael saw Matthew only once. In December 2012, Michael and Danielle sent Christmas presents to Katie, who was still living at her parents' house, which Katie received.

¶4.    In January 2013, Michael briefly moved to Atlanta, Georgia. Michael emailed Katie on January 20, 2013, requesting to set up a visitation schedule to see Matthew:

> Hi. I hope this message finds you in good health and spirit. I have tried to call you but I can not reach you so I am sending this email. First of all how is [Matthew] doing? I know he is big now and I hope he walking now. I just want the opportunity to express some things to you. I would like to share some feelings I have, some thing I would like to apologize for and to come up with

---

[2] Michael was originally from Tallahassee, Florida, and came to Mississippi to attend college.

2

a plan for me to be involved in [Matthew's] life. Please give me a call when you can or send and email or text whenever you can.

The email, however, did not contain a domain address (i.e., "@yahoo.com"), so Katie never received it. Believing that he and Katie would establish a proper visitation schedule, Michael moved back to Mississippi in February 2013. Michael tried to call Katie to bring Matthew to his apartment, but she refused because she did not want Michael to be alone with Matthew. A month later, Katie brought Matthew to a restaurant so that Michael could spend time with him. That same month, Katie and Matthew moved into an apartment complex with her then fiancé John Jones, whom she had been dating since October 2012. Michael did not see Matthew again until November 2013. During Thanksgiving in 2013, Katie brought Matthew to a hotel to visit Michael and Danielle. This would be the last time that Michael would see Matthew.

¶5. The Department of Human Services (DHS) filed a complaint for support and other relief against Michael on April 14, 2014, in the Forrest County Chancery Court. Michael obtained counsel in November 2014. An order for a continuance was filed in December 2014. During the same month, Michael and Danielle attempted to send Christmas presents to Matthew. They again mailed the presents to Katie's parents' house, but this time the presents were returned to them.

¶6. On February 17, 2015, the court entered an agreed judgment for support and other relief, which was signed by both parties' counsel. The judgment stated that beginning on March 1, 2015, Michael was required to pay $140 per month for Matthew's child support until Matthew reaches the age twenty-one. Additionally, Michael was ordered to pay $25 per

3

month for Matthew's medical support. Michael paid both the child support and medical support. Although Michael obtained counsel for both the child support claim and to establish visitation rights, his counsel did not file anything regarding visitation or custody until April 2016.

¶7. Michael filed a complaint to establish paternity, for permanent custody, for a temporary judgment, and for other relief on April 11, 2016. Michael requested full legal and physical custody of Matthew and that Katie be ordered to pay child support. Further, if the court did not award him full custody, then Michael requested that the court should award him joint legal custody. Additionally, Michael requested visitation.[3] Michael also requested temporary custody while the case was pending.

¶8. On April 20, 2016, Katie signed a voluntary acknowledgment of paternity, establishing that Michael was Matthew's biological father. Katie's counsel also prepared a prepared temporary order that Katie signed, which was given to Michael for his review. The temporary order stated (1) that Michael would see Matthew once per week for two hours outside of Michael's apartment; (2) that Katie must be present during visitation; (3) that the parties would coordinate when and where the visits were to take place; and (4) that telephone visitation would be allowed three times per week, including video calls. On April 26, 2016, Michael's counsel sent a letter to Katie's counsel, rejecting the temporary order because Michael wanted more visitation. Later that year, on an undisclosed date, Katie's fiancé John

---

[3] Michael requested that at a minimum, he should be awarded visitation with Matthew for every other weekend from 6:00 p.m. on Fridays until 6:00 p.m. on Sundays, one half of the summer months, and one half of all holidays.

sent Michael the following Facebook message:

> You may or may not know me but I'm [Katie's] fiancé. She told me she called you today about getting his name changed and you said you wanted joint custody. She also said you think she has been keeping you from [Matthew]. How about this, you can see [Matthew] when you would like. You want to see him just call and we can set something up. We want to change his name because he has never been called [Matthew] and he only knows his name to be [Kameron[4]]. I don't know your reasons to not be a father to him but saying we have kept him from you is false. I have raised him these last 3 years and you would have to kill me to keep me from him. You want to see him then act like it. The fact that you have a picture of him on your profile that you didn't even take from 2 years ago shows to me that you aren't serious about being a father. If you want to be a father take the proper steps to be one. Also if you don't want the responsibility you can sign your rights over and keep doing what you been doing and no one will know the difference. I raise him and would give my life for his happiness. So if you feel the same way act like it and talk to me about it.

Michael did not respond to John's message.[5] There was no communication between Michael and Katie until 2017.

¶9.     In February 2017, both Michael's and Katie's lawyers moved to withdraw from the case. The court granted both motions in March 2017. For about a year, nothing happened in the case.[6]

¶10.     Michael obtained new counsel on March 14, 2018. A hearing for visitation took place on May 9, 2018, which Katie failed to attend. Because Katie failed to appear at the hearing,

---

[4] Katie and John did not call Matthew by his legal name but gave him a new name entirely.

[5] Even though Michael did not respond, he was under no obligation to answer because John had no legal authority regarding Matthew.

[6] Michael moved back to his hometown of Tallahassee, Florida, in October 2017, where he still resides.

on July 17, 2018, the chancery court awarded Michael joint legal custody and delineated his visitation rights to every other weekend from Friday at 6:00 p.m. to Sunday 6:00 p.m., four weeks in the summer, and holiday visitation.

¶11.   On August 22, 2018, under new counsel, Katie filed a Mississippi Rule of Civil Procedure 60 motion for relief from judgment and a counter-petition for termination of parental rights, modification of child support, and other relief.  Katie asserted that she had only received notice of the hearing on the same day as the hearing and that Michael's counsel assured her that no order would be entered.  Regarding terminating Michael's parental rights, Katie asserted that Michael had not had a relationship with Matthew since the first few months of Matthew's life.  Katie sought to terminate Michael's parental rights on the grounds of abandonment, desertion, unwillingness to provide reasonable and necessary food and clothing, shelter, and/or medical care, failure to exercise reasonable visitation or communication with the child, substantial erosion of the parent-child relationship, and any and all other applicable factors under Mississippi Code Annotated sections 93-15-119 and 93-15-121 (Supp. 2017).  Additionally, Katie requested the court to appoint a guardian ad litem (GAL).

¶12.   On September 17, 2018, Michael responded to Katie's motion, generally denying all allegations.  In addition, Michael filed a counterclaim for contempt, stating that Katie failed to abide by the court's order to allow visitation.  Michael claimed that Katie was hostile when he asked about visitation.  Michael also requested that Katie be sanctioned or incarcerated.  Katie filed a motion to dismiss Michael's counterclaim for contempt on October 3, 2018.

¶13. The chancery court granted Katie's Rule 60 motion without a hearing on November 5, 2018, finding that the motion was well-taken. Therefore, the court voided the order awarding Michael visitation rights and granting other relief that was entered on July 17, 2018.

¶14. On November 14, 2018, the chancery court judge appointed a GAL to investigate and make a recommendation about what would be in the best interest of the child.

¶15. The trial took place on August 22, 2019, and September 18, 2019. Five witnesses testified, including Michael, Katie, John, Danielle, and the GAL. Prior to the witnesses' testimonies, Michael withdrew his request for custody and proceeded on the issue of visitation.

¶16. Michael testified that he and Katie lived together from January 2012 to June 2012 and that he would often keep Matthew by himself. Michael stated that he moved to a new location and requested that Katie and Matthew move in with him, but she declined because she did not want to go against her father's wishes. Michael testified that he met with Katie to discuss his visitation rights for Matthew, but their discussions always led to arguments. After a brief move to Atlanta, Georgia, Michael came back to Mississippi to be closer to Matthew. He testified that he discussed a plan with Katie regarding co-parenting Matthew: Michael would keep Matthew during the day and work a night job. But Michael stated that Katie did not want him to be alone with Matthew for unknown reasons. The last time that he had seen his son was in November 2013.

¶17. In 2012 and 2013, Michael stated that "all of [his] efforts to see [his] son was just

purely through [Katie]." After 2013, he relied on his attorney to "handle everything," including his visitation with Matthew. According to Michael, he hired the attorney to defend him regarding the child support action, and the attorney was supposed to simultaneously file a joint custody action as well. Michael testified that although he had formed a relationship with Katie's parents, he never contacted them about seeing Matthew because he was afraid. Michael also admitted that Katie invited him to Matthew's fifth birthday party in 2017. Michael testified that Katie only invited him the day before the party and that he had to work that day. Because of this, he did not respond to Katie's message. The last time that Michael sent Matthew any gifts was in 2014. He testified that he did not send any gifts after 2014 because of financial reasons and because his prior gifts had been returned to him. Other than correspondences in 2012 and 2013, Michael did not have any other proof of communication with Katie regarding seeing Matthew. Michael also stated that his financial circumstance would change in the future. He testified that only made $18,000 yearly at the time of trial, but he was in school to be a statistician, which had a median average of $80,000 yearly.

¶18. Danielle, Michael's mother, testified that in 2014, she and Michael sent Christmas presents to Katie's parents' house, but the presents were returned to them. She also sent Katie text messages in 2016, asking about Matthew's sizes and what they should get Matthew for Christmas gifts, but she never received a response.

¶19. According to Katie, the last time that Michael had seen or contacted his son was in November 2013. Katie testified that she had started dating her fiancé, John, in October 2012 and that they had moved in together in March 2013. John had always referred to Matthew

8

as his son.[7] Katie also testified that she was unaware about any Christmas presents in 2014 that were mailed to her but returned to Michael. Katie stated that she was aware of the Facebook message that John had sent to Michael but thought it would be best if John acted as a mediator for her and Michael. Katie testified that around Christmas time in 2016, she did receive Danielle's text messages regarding gifts for Matthew, but she did not respond because "we were in a bunch of legal mess." But whenever Michael sent her text messages, she always responded.

¶20.   Katie also testified that she invited Michael to Matthew's fifth birthday party, but he never responded to her invitation. Additionally, she stated that she has had the same phone number for seventeen years, so she was accessible to Michael. Katie stated that John has filled the father role for Matthew, and he wants to legally adopt him   According to Katie, Matthew had only known John to be his father and refers to John as "Dad."

¶21.   John testified that because Michael made no real attempts to visit Matthew between 2013 and 2016, he decided to send Michael a Facebook message to reunite Michael with Matthew. According to John, the message was not aggressive or threatening. John further testified that he really loves Matthew and that if the court terminated Michael's parental rights, then he would adopt Matthew. John also stated that Matthew refers to him as "Dad." The court recessed until the second day of trial.

¶22.   Prior to the continuance of trial, the GAL filed a preliminary report on September 11, 2019. The GAL interviewed Matthew, Michael, Katie, John, Danielle (Matthew's paternal

---

[7] Katie and John have one daughter together.

grandmother), and Justin Doe (Matthew's maternal grandfather). The GAL reported that while Michael had been paying child support since early 2015, he abandoned Matthew because he had not had any contact with the child in over a year. The GAL stated that Michael told her that he had not seen Matthew since around Thanksgiving 2013 and presented little to no evidence that he made attempts to contact Michael. According to the GAL, although Michael averred that Katie thwarted his efforts to see Matthew, Michael presented little to no evidence of this either. Therefore, the GAL found that Michael relinquished his parental duties by clear and convincing evidence and recommended that the court terminate Michael's parental rights.

¶23. The trial resumed on September 18, 2019. Consistent with her report, the GAL testified and recommended that it would be in the best interest of the child to terminate Michael's parental rights on the ground of abandonment. She also testified that reunification would not be suitable because Michael failed to exercise reasonable visitation or communication with the child and that there was a substantial erosion of the relationship between the parent and the child.

¶24. The chancery court issued an opinion and final judgment terminating Michael's parental rights on October 4, 2019. The court found that there was no proof that Michael had made reasonable efforts to visit Matthew since November 2013. Specifically, the court cited that Michael had not attempted to set up a visitation schedule to see Matthew other than once when he sent an email to a defective email address. Although the court found that Michael continued to pay child support, this did not overcome the fact that Michael had not seen

Matthew in over five years. The court also found that reunification between Michael and Matthew was not desirable toward obtaining a satisfactory permanency outcome. Based on Michael's five-year absence from Matthew, and the fact that Matthew referred to John as his "Dad," this created a substantial erosion in Michael's and Matthew's relationship. Therefore, the court terminated Michael's parental rights along with his child support payments.

¶25. On November 1, 2019, Michael appealed, raising the following issues: whether the court abused its discretion by terminating his parental rights and finding that he had abandoned Matthew; whether the court failed to give proper weight to the statutory defense that he provided financial support and that his visitation was thwarted by Katie; and whether the court abused its discretion by finding that his termination of parental rights was in the best interests of the child. We find that the chancery court did not err in terminating Michael's parental rights because there was clear and convincing evidence to support its findings.

**Standard of Review**

¶26. In cases where parental rights have been terminated, our scope of review is limited." *Little v. Norman*, 119 So. 3d 382, 385 (¶12) (Miss. Ct. App. 2013) (quoting *In re Adoption of M.C.*, 92 So. 3d 1283, 1286-87 (¶18) (Miss. Ct. App. 2012)). "[T]he [C]ourt asks not how we would have decided the case ab initio but whether there is credible proof to support the chancellor's findings of fact by clear and convincing evidence." *Id*. "We review the chancellor's factual findings under the manifest error/substantial credible evidence test." *Id*. "This Court will not overturn a chancellor's findings of fact when supported by substantial

11

evidence unless an erroneous legal standard is applied or is manifestly wrong." *Id.*

¶27. We recognize that Michael has lost his fundamental right to be a parent to Matthew. In *Troxel v. Granville*, 530 U.S. 57 (2000), the United States Supreme Court stated that "the liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court." *Id.* at 65. "Fundamental as it is, a parent's right is not absolute and must be weighed against a child's right to grow up with the opportunity to become well adjusted." *Barnes v. McGee*, 178 So. 3d 801, 804 (¶10) (Miss. Ct. App. 2013) (quoting *In re A.M.A.*, 986 So. 2d 999, 1009-10 (¶¶22-23) (Miss. Ct. App. 2007)).

¶28. "[I]n Mississippi, as in other jurisdictions, there exists a strong presumption in favor of preserving parental rights." *J.P. v. L.S.*, 290 So. 3d 345, 356 (¶37) (Miss. Ct. App. 2019). (quoting *In re A.M.A.*, 986 So. 2d at 1009 (¶22)). "Only where that presumption is overcome by clear and convincing evidence is termination appropriate." *Id.*

¶29. In determining whether the chancery court erred in terminating Michael's parental rights, our review is two-fold. *A.B. v. R.V.*, No. 2017-CA-00792-COA, 2019 WL 5168558, at \*2 (¶15) (Miss. Ct. App. Oct. 25, 2019). We first review the chancellor's decision that Michael's conduct constituted abandonment. *Id.*; *see* Miss. Code Ann. § 93-15-119. Then, "[i]f the chancellor's decision was supported by substantial credible evidence, our analysis shifts to whether the chancellor should have found that reunification was desirable 'toward obtaining a satisfactory permanency outcome.'" *Id.*; *see* Miss. Code Ann. § 93-15-121.

¶30. "Before a state may sever completely and irrevocably the rights of parents in their

natural child, due process requires that the state support its allegations by at least clear and convincing evidence." *M.H. v. D.A.*, 17 So. 3d 610, 616 (¶19) (Miss. Ct. App. 2009) (quoting *Santosky v. Kramer*, 455 U.S. 745, 747-48 (1982)). "The chancellor must find grounds for termination by clear and convincing evidence in order to terminate the parental rights of a parent regarding the child." *Id*. (quoting *A.C.W. v. J.C.W.*, 937 So. 2d 1042, 1045 (¶12) (Miss. Ct. App. 2007)). We define clear and convincing evidence as

> [the] weight of proof which produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable the fact finder to come to a clear conviction, without hesitancy, of the truth of the precise facts of the case.

*Moore v. Bailey*, 46 So. 3d 375, 384 (¶35) (Miss. Ct. App. 2010) (quoting *Johnson v. Bay City S. Mortg. Co.*, 928 So. 2d 888, 892 (¶14) (Miss. Ct. App. 2005)).

¶31. "On appeal, it is not the appellate court's role to substitute its judgment for the chancellor's." *Owens v. Owens*, 169 So. 3d 925, 927 (¶8) (Miss. Ct. App. 2014) (citing *K.D.F. v. J.L.H.*, 933 So. 2d 971, 975 (¶14) (Miss. 2006)). "Instead, we look for whether credible proof exists to support the chancellor's finding of fact by clear and convincing evidence, keeping in mind the best interest of the child is the paramount consideration." *Id*. (citing *In re K.D.G. II*, 68 So. 3d 748, 751 (¶12) (Miss. Ct. App. 2011)).

**Discussion**

¶32. Mississippi Code Annotated section 93-15-119(1)(a)(i)-(ii) provides that a court may terminate the parental rights of a parent when, after conducting an evidentiary hearing, the court finds by clear and convincing evidence

13

> [t]hat the parent has engaged in conduct constituting *abandonment* or desertion of the child, as defined in Section 93-15-103, or is mentally, morally, or otherwise unfit to raise the child, which shall be established by showing past or present conduct of the parent that demonstrates a substantial risk of compromising or endangering the child's safety and welfare; and that termination of the parent's parental rights is appropriate because reunification between the parent and child is not desirable toward obtaining a satisfactory permanency outcome.

(Emphasis added). Only one statutory ground is needed for termination of parental rights. *Owens*, 169 So. 3d at 927 (¶7). In this case, the chancellor analyzed the facts and determined that Michael abandoned Matthew.

### A. Applicable Law: Abandonment

¶33. Mississippi Code Annotated section 93-15-103(a) (Supp. 2017) defines abandonment as "any conduct by the parent, whether consisting of a single incident or actions over an extended period of time, that evinces a settled purpose to relinquish all parental claims and responsibilities abandonment may be established by showing that . . . (ii) [f]or a child who is three (3) years of age or older on the date that the petition for termination of parental rights was filed, . . . the parent has deliberately made no contact with the child for at least one (1) year."

¶34. "Abandonment is defined as 'any conduct by a parent which evinces a settled purpose to forego all duties and relinquish all parental claims to the child.'" *M.H.*, 17 So. 3d at 616 (¶19) (quoting *S.N.C. v. J.R.D. Jr.*, 755 So. 2d 1077, 1081 (¶11) (Miss. 2000)). "The test is an objective one: whether under the totality of the circumstances, be they single or multiple, the natural parent has manifested his severance of all ties with the child." *Id.* (quoting *Ethredge v. Yawn*, 605 So. 2d 761, 764 (Miss.1992)). "If a petitioner successfully

14

demonstrates by clear and convincing evidence that the objecting natural parent has abandoned their child, then the court will consider the best interest of the child." *Id.* (citing *J.C.N.F. v. Stone Cnty. Dep't of Human Servs.*, 996 So. 2d 762, 766 (¶12) (Miss. 2008)). But there is support for a chancery court not to terminate parental rights when there is interference with the relationship. *L.O. v. G.V.*, 37 So. 3d 1248, 1255 (¶33) (Miss. Ct. App. 2010).

### B. The GAL's Recommendations

¶35. Under Mississippi Code Annotated section 93-15-107(1)(d) (Supp. 2016), in cases of involuntary termination of parental rights, a GAL shall be appointed to protect the best interest of the child, except that the court, in its discretion, may waive this requirement when a parent executes a written voluntary release to terminate parental rights. In order to ensure the child's best interests, the court must "(1) select a competent person to serve as the GAL, (2) [choose] someone with no adverse interest to the minor, and (3) adequately instruct this person on the proper performance of his or her duties." *Farthing v. McGee*, 158 So. 3d 1223, 1226 (¶16) (Miss. Ct. App. 2015) (citing *In re R.D.*, 658 So. 2d 1378, 1383 (Miss.1993), *overruled on other grounds by In re J.T.*, 188 So. 3d 1192, 1201-02 (¶¶49, 51)).

¶36. On September 11, 2019, the GAL in this case prepared a preliminary report, which was entered into evidence and considered by the court. She recommended that Michael's parental rights be terminated. Consistent with her report, the GAL testified to the following:

> [Michael] has not seen the child since November of 2013. He was invited to the birthday party. He did not attend. I think in the direct answer to your question, no, it is not usual that a parent would miss an activity of a child's life because they were working, but at this point if you're trying to see your child

and you haven't seen your child since November of 2013 and if he was claiming that she was thwarting his efforts to see the child, an invitation it seems to me that you would make all attempts to attend or to take an opportunity to spend time with a child when it's offered.

The GAL testified to the following in regards to whether future contact is desirable:

[T]he standard is whether [Michael] has taken the -- has he exercised his parental rights and responsibilities because you have a child who is not able to take care of themselves. They depend on somebody for food, clothing, shelter, love, emotional support, educational support, and I think the testimony in this case shows that the last time [Michael] has seen the child is November of 2013. He has provided nothing for this child except for child support. He has paid child support. That's the only thing he has going for him.

The GAL also testified that Michael failed to exercise reasonable visitation or communication with the child pursuant to Mississippi Code Annotated section 93-15-121(e). Additionally, the GAL testified that Michael's actions constituted abusive or neglectful conduct. These actions have caused, "at least in part, an extreme and deep-seated antipathy by the child toward the parent, or some other substantial erosion of the relationship between the parent and the child" pursuant to Mississippi Code Annotated section 93-15-121(f). Furthermore, the GAL testified that Katie did not prohibit Michael from visiting or communicating with Matthew.

¶37. The GAL opined that despite Michael's "minor financial contribution," Michael's five-year absence and his actions over an extended period of time was enough to relinquish all of his parental claims and responsibilities. The chancellor accepted the GAL's recommendations and found that Michael had made no contact with Matthew for a period of one year, which satisfied the statutory requirement under section 93-15-103(a)(ii) to terminate his parental rights.

¶38. We find that the chancery court did not err in terminating Michael's parental rights. In *In Adoption of Harmon v. Ingle*, No. 2018-CA-00114-COA, 2019 WL 2003943 (Miss. Ct. App. May 7, 2019), we found that there was sufficient evidence to terminate a father's parental rights when he did not make reasonable efforts to see his children. *Id*. at *3 (¶12). In that case, the father testified that he attempted to contact the child's mother about seeing his children to no avail, but there was no credible evidence to support this claim. *Id*. Further, the father admitted that he stopped trying to contact the child's mother. *Id*. But he admitted that he knew where her parents lived and worked, meaning that he could have contacted them about seeing his children. *Id*. Because we found that the father in that case had not seen his children in over three years and did not make reasonable efforts to do so, we affirmed the chancery court's ruling to terminate his parental rights. *Id.* at *4 (¶16).

¶39. Here, when the termination proceedings had begun, Michael had failed to communicate with Matthew in over four years. All of the witnesses testified that Michael had not seen Matthew since 2013. Michael testified that after 2013, he did not make any real efforts to communicate with Katie about seeing or talking to Matthew, nor did he attempt to contact her parents in regard to seeing Matthew. Instead, he relied solely on his counsel to handle the visitation matter. This Court has stated that a mistaken belief that a parent was not allowed to contact another parent pending a termination of parental rights suit does not overcome a clear and convincing showing of abandonment. *Fuller v. Weidner*, 147 So. 3d 380, 382 (¶8) (Miss. Ct. App. 2014).

¶40. Furthermore, Michael argues that he did not abandon Matthew because he continued

17

to pay child support and that Katie thwarted his attempts to see Matthew.[8]  However, there is no proof in the record that indicates that Katie thwarted his attempts to see Matthew. Again, Michael admitted that he did not make any real effort to communicate with Katie regarding visitation with Matthew after 2013.  Michael and his mother, Danielle, testified that they had sent presents to Matthew to Katie's parents' house in 2014.  However, Michael admitted that he did not attempt to send any more gifts to Matthew after that year. Additionally, both Katie and her fiancé, John, contacted Michael regarding visitation with Matthew in 2016, but Michael still did not visit or communicate with his son.  In 2017, Katie extended a birthday invitation to their son's fifth birthday party, but Michael failed to respond to the invitation and did not attempt to contact Katie regarding seeing or talking to Matthew after the invitation.  There is evidence that Michael could have seen or at the very least communicated with Matthew but for unknown reasons chose not to do so.  Based on the GAL's recommendations and witness testimonies, we find that the chancery court properly determined there was clear and convincing evidence that Michael failed to exercise reasonable visitation or communication with his child, constituting abandonment.

### C.  Reunification

¶41.  Mississippi Code Annotated section 93-15-121 provides that "if established by clear and convincing evidence, [any of the eight alternative bases] may be grounds for termination

---

[8] In his brief, Michael uses Mississippi Code Annotated section 93-15-119 (2)(a)-(b) (Supp. 2016), which states that an allegation of desertion may be fully rebutted by proof that the parent either provided financial support or was willing to visit the child, but reasonable attempts to do so were thwarted by the mother or her agents.  But the court found no evidence that Katie thwarted his visitation.

of the parent's parental rights if reunification between the parent and child is not desirable

toward obtaining a satisfactory permanency outcome[.]" The chancery court used one of the

eight alternative bases for finding reunification undesirable:

> (f) The parent's abusive or neglectful conduct has caused, at least in part, an extreme and deep-seated antipathy by the child toward the parent, or some other *substantial erosion of the relationship between the parent and the child.*

(Emphasis added). "A finding of substantial erosion of the parent/child relationship

necessarily involves a consideration of the relationship as it existed when the termination

proceedings were initiated." *In re K.D.G. II*, 68 So. 3d 748, 752-53 (¶22) (Miss. Ct. App.

2011) (quoting *G.Q.A. v. Harrison Cnty. Dep't of Human Res.*, 771 So. 2d 331, 338 (¶29)

(Miss. 2000)). "A substantial erosion can be proved by showing a prolonged absence and

lack of communication between the parent and the child." *Fuller*, 147 So. 3d at 382 (¶9)

(quoting *Ainsworth v. Natural Father*, 414 So. 2d 417, 420 (Miss. 1982)).

¶42. It is undisputed that Michael had been nominally providing for Matthew financially

through child support since March 2015. However, at the time that the termination

proceedings were initiated, Michael had not seen or talked to Matthew in over four years.

This Court has found that a substantial erosion of a relationship between a parent and a child

existed when the relationship was deemed "non-existent." *A.B.*, 2019 WL 5168558, at *6

(¶37). Furthermore, the paramount concern in determining the proper disposition continues

to be the best interest of the child, not reunification of the family." *In re K.D.G. II*, 68 So.

3d at 754 (¶28) (quoting *May v. Harrison Cnty Dep't of Human Servs.*, 883 So. 2d 74, 81

(¶22) (Miss. 2004)). It is clear that Michael had not had a relationship with Matthew since

2013. He had not seen nor talked to Matthew since 2013. Michael stated that he did not attempt to see or communicate with his Matthew since 2013, nor did he attempt to send Matthew Christmas or birthday presents since 2014. Furthermore, Matthew no longer recognizes him to be his father and only recognizes John as his "Dad." Based on Michael's own testimony and his almost five-year absence from Matthew's life, we find that there was clear and convincing evidence that supported the chancellor's decision that reunification between Michael and Matthew was not desirable toward obtaining a satisfactory permanency outcome.

### D. Best Interest of the Child

¶43. "Even where one of the grounds for termination is proven by clear and convincing evidence, the trial court must still consider whether 'termination is in the best interest of the child.'" *A.B.*, 2019 WL 5168558, at *7 (¶38) (quoting *Brown v. Panola Cnty. Dep't of Human Servs.*, 90 So. 3d 662, 665 (¶11) (Miss. Ct. App. 2012)). The Mississippi Supreme Court has stated that "the sole reason for the appointment a guardian ad litem is to ensure that the best interest of a minor child is fully sought out and protected." *M.J.S.H.S. v. Yalobusha Cnty. Dep't of Human Servs. ex rel. McDaniel*, 782 So. 2d 737, 741 (¶17) (Miss. 2001) (citing Miss. Code Ann. § 93-15-107 (Rev. 1994)). The GAL recommended that it would be in the best interest of Matthew that Michael's parental rights be terminated based on Michael's absence, John's presence, and the confusion that Matthew would have establishing his father. The chancery court followed the GAL's recommendation, finding that Michael had abandoned Matthew. While we may have come to a different conclusion, "it is not this

Court's role to substitute its judgment for the chancellor's." *J.P*, 290 So. 3d at 356 (¶36). Therefore, we cannot say that the chancery court manifestly erred in its decision.

### Conclusion

¶44. Finding that there was substantial, credible, clear, and convincing evidence to support the chancery court's determination in terminating Michael's parental rights and that reunification would not be suitable, we affirm the chancery court's ruling.

¶45. **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., GREENLEE, WESTBROOKS, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR. WILSON, P.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**